David O. Boehm, J.
The defendant, indicted for the crime of criminally negligent homicide in violation of section 125.10 of the Penal Law, now brings four motions, as follows:
(1) Motion to dismiss the indictment for insufficiency on its face;
(2) Motion to dismiss the indictment for the reason that it is based upon a statute so vague and indefinite as to be unconstitutional;
(3) Motion for a bill of particulars ;
(4) Motion for inspection of the autopsy report.
The motion for inspection of the autopsy report is not opposed by the People.
*430 The defendant’s heaviest attack against the indictment is directed against its constitutionality and the resolution of that motion may well resolve the others.
In 1967, for the first time in New York, the crime of criminally negligent homicide, as it is now defined, was established by section 125.10 of the Penal Law. It has been the subject of many articles and was both abused and defended when it was still gestating in the American Law Institute’s Model Penal Code. As an example of legislative brevity and occultness, it is probably without peer. ‘ ‘ A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person. ’ ’
The criticism directed against it arising out of the absence of mens rea appears to be without substance, for this is not the first time criminal sanctions have been imposed and upheld without malus animus. Our megalopolitan industrial age, with its ceaseless boil and swell of cities and impacted populations, has seen the eclipse of mens rea in very many areas of activity which have been legislatively denominated mala proMbita.
“ Traffic of velocities, volumes and varieties unheard of came to subject the wayfarer to intolerable casualty risks if owners and drivers were not to observe new cares and uniformities of conduct. Congestion of cities and crowding of quarters called for health and welfare regulations undreamed of in simpler times. Wide distribution of goods became an instrument of wide distribution of harm when those who dispersed food, drink, drugs, and .even securities, did not comply with reasonable standards of quality, integrity, disclosure and care. Such dangers have engendered increasingly numerous and detailed regulations which heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare.
“ While many of these duties are sanctioned by a more strict civil liability, lawmakers, whether wisely or not, have sought to make such regulations more effective by invoking criminal sanctions * * * Whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element * * * This has not, however, been without expressions of misgiving.” (Morissette v. United States, 342 U. S. 246, 254-256; Clark & Marshall, A Treatise on the Law of Crimes [7th ed.], § 5.10; Packer, The Limits of the Criminal Sanction, ch. 6, pp. 111-127 [citing the crimes of statutory rape and bigamy as examples of strict liability offenses without mens rea]; People *431 v. Nelson, 309 N. Y. 231; Tenement House Dept. v. McDevitt, 215 N. Y. 160; People v. Buddensieck, 103 N. Y. 487; People v. Polstein, 184 App. Div. 260, affd. 226 N. Y. 593; United States v. Dotterweich, 320 U. S. 277; and most recently again upheld by the Court of Appeals in People v. Transamerican Frgt. Lines, 24 N Y 2d 727, 731 [June, 1969].)
The heaviest barrage of contrary comment developed from the imposition of penal liability upon conduct which had been traditionally regarded as deserving only civil penalties, e.g., Hall, Negligent Behavior Should Be Excluded from Penal Liability (63 Col. L. Rev. 632) which points out (p. 633) that the inclusion of negligence in the Penal Law imposes the impossible task of determining whether a person about whom very little is known, has the competence to be aware of or perceive or appreciate the duties and dangers in a particular situation. (See, also, Is Criminal Negligence a Defensible Basis for Penal Liability?, 16 Buffalo L. Rev. 749.)
Although negligence was criminally punishable before the adoption of the Revised Penal Law (§ 1053-a of the old Penal Law), an examination of those cases discloses that their definition of criminal negligence is poles apart from the present one in the law, which is defined as follows: “ A person acts with criminal negligence with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.” (Penal Law, § 1505, subd. 4.)
Regardless of the difficulty one may have in straining to comprehend a workable meaning of this definition, one thing is clear; criminal negligence is not what it was. It no longer contains the element of recklessness which is now made a basis of the charge of murder (§ 125.25, subd. 2.), or manslaughter in the second degree (§ 125.15, subd. 1).
“ Recklessly ” is defined: “ A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxi *432 cation also acts recklessly with respect thereto.” (Penal Law, § 15.05, subd. 3.)
Historically recklessness was always required before one could be held liable for negligent homicide. In his seminal opinion in 1927 in People v. Angelo (246 N. Y. 451) Judge Andrews called attention to the fact that in 1664 the distinction had already been made between negligence so great as to result in criminal responsibility and that slight degree of negligence which fell far short of a criminal charge. «Referring to the cases, Judge Andrews observed (p. 455): “ They use such words as ‘ gross,’ 1 reckless, ’ ‘ culpable ’. Consistently, they, assert, expressly or by implication, that something-more is required than the bare negligence that might be sufficient to support a civil action.”
In 1828 precise definitions of the different homicidal crimes were made. It is interesting to note that the Penal Code revisers in their notes, even then, spoke of apportioning the punishment to the seriousness of the offense and suggested the enactment of a crime of manslaughter in the fourth degree where the accused, engaging in a lawful act where there was no apparent risk to life, but not using ordinary care and caution, kills another. But, as Judge Andrews recalls: ‘£ Evidently the Legislature was not satisfied with this definition. Its intent was to soften existing rules, not to make them more rigorous. It contained eminent lawyers well instructed as to the common law. It, therefore, struck out this clause. There remained the provision as to killing by ‘ culpable negligence ’ practically in the same form as it has existed ever since. It would seem clear, therefore, that the Legislature used the word in the same sense as it had been used for centuries — as the equivalent of ‘ criminal, ’ ‘ reckless, ’ ‘ gross, ’ such negligence as it is worthy of punishment.” (pp. 456--457; emphasis supplied).
The definition of negligence worthy of punishment continued to be surveyed, staked out and traveled upon. Although there were turns, curves and occasional intersections, by 1967 its highways and by-ways were laid out and the guideposts were clear. “ Innumerable have been the decisions of the courts passing ..upon the question of negligence. The path has been pretty well cut out and emblazoned along which a man must proceed to avoid the charge of negligence.” (People v. Grogan, 260 N. Y. 138, 146-147 [1932].)
Consistently the courts refused to punish negligence criminally for that which a defendant merely failed to perceive and made the ‘ ‘ conscious disregard ’ ’ standard the traditional test for reckless conduct. (Is Criminal Negligence, a Defensible Basis for Penal Liability?, 16 Buffalo L. Rev. 749, 753.)
*433 In 1956 the Court of Appeals again, analyzing what was meant by criminal negligence under section 1053-a of the old Penal Law, said: “ The terms ‘ reckless ’ and ‘ culpably negligent ’ not only have a definite and certain inherent meaning, but also have a determinative significance acquired through a history of judicial construction which long antedates this enactment * * * An analysis of the decisions indicate, that ordinary negligent conduct — 'that is, negligent conduct arising from carelessness, inadvertence, lack of skill, competence or foresight — would not be a sufficient basis to predicate a conviction where reckless or culpably negligent conduct was required. * * * As the terms signify, this conduct arises when the actor has knowledge of the highly dangerous nature of his actions or knowledge of such facts as under the circumstances would disclose to a reasonable man the dangerous character of his action, and despite this knowledge he so acts. ’ ’ (People v. Eckert, 2 N Y 2d 126, 130-131; emphasis supplied.)
Consistently, historically and uniformly, recklessness and culpably negligent conduct or criminal negligence were equated as arising out of the same type of conscious disregard for the rights of others. Knowledge, actual or imputed, of the risk, disregard of that risk, and the death of another resulting from the actual or imputed conscious choice of acting or not acting in a certain way, were the essential ingredients which brought about the law’s opprobrium.
“ With this knowledge * * * he deliberately took a chance by making a conscious choice of a course of action, in disregard of the consequences which he knew might follow from his conscious act, and which in this case did ensue. How can we say, as a matter of law that this did not amount to culpable negligence within the meaning of section 1053-a? * * *
“ His awareness of a condition that he knows may produce such consequences as here, and his disregard of the consequences, renders him liable for culpable negligence, as the courts below have properly held ” (People v. Decina, 2 N Y 2d 133, 140; emphasis supplied).
In People v. Joseph (11 Misc 2d 219) Judge Sobel discussed the degree of proof required and the elements of so-called “lawful act” and “unlawful act” homicides and noted that the degree of proof required with respect to every element of a crime of so-called ‘ ‘ lawful act ’ ’ homicide is much greater than is required in an “unlawful act” homicide, particularly with respect to proof of knowledge or awareness of risk. In a scholarly opinion with an abundant reference to authorities, the court noted (p. 234): “ The principle that an injury can only *434 amount to a crime when it is inflicted intentionally is as old as the criminal law itself. # * * Legislatures and the courts have always been reluctant to impose the social condemnation of criminal conviction on those who act with complete moral innocence. - *
1 ‘ Unlawful act homicide is only an apparent exception. Most courts require proof of such a degree of negligence, 1 culpable ’ or 1 criminal ’ or ‘ gross ’ as is the ‘ equivalent ’ of criminal intent.” (Emphasis in original.)
The court refers to Corpus Juris Secundum (vol. 40, Homicide, p. 926) wherein it is stated: “It is ordinarily required that the negligence on which involuntary manslaughter may be based must be of a gross or flagrant character, such as would show wantonness or recklessness, or would evince a reckless disregard of human life or the safety of others, or indifference to consequences, equivalent to criminal intent.”
The conscious disregard test was also followed in Matter of Marinis v. Supreme Court (20 A D 2d 79, revd. on other grounds 15 N Y 2d 240) which also dealt with a section 1053-a crime and held that the standard for both recklessness and criminal negligence was a conscious disregard or reckless disregard for the consequences which one knew might follow. In the Matter of Jenson v. Fletcher (277 App. Div. 454, 457-458, affd. 303 N. Y. 639) the Fourth Department stated: “‘Gross’, ‘culpable’, ‘ criminal ’ and ‘ reckless ’ are the equivalent of each other in meaning and sense when applied to negligence. * * * Such meaning is the same whether applied in cases of manslaughter, negligently causing death, reckless driving or the section of the Vehicle and Traffic Law here under consideration. * * * [Both] the words ‘ gross negligence ’ and the phrase ‘ in a manner showing a reckless disregard for life or property of others ’ * * * import a disregard of the consequences of the act and an indifference to the rights of others. ’ ’
The Revised Penal Law now directs the courts to punish an individual for failing to perceive, a state of mind which was not previously regarded as a form of wrongdoing.
“Ironically, there is no indication that the commission was aware that its inclusion of failure to perceive added a new culpable mental state. The revisers’ only justification for the change was to clarify the existing conceptual confusion between the definitions of recklessness and criminal negligence. (Prop. N. Y. Pen. Law, Comm’n Staff Notes Sec. 45.05). However, the commission appears to have overlooked the fact that this conceptual confusion was an outgrowth of an underlying policy decision by the New York courts that a conscious disregard of *435 risk be the minimal standard for criminal conviction. It is questionable whether, had the commission been aware of this policy choice, it would have made failure to perceive, and not conscious disregard the minimal standard for criminal culpability.
‘1 It may be argued that the Commission for the Revision of the Penal Law was aware of the courts’ policy of excluding negligence, but deliberately added failure to perceive as a new culpable mental state. If this was the commission’s intention, one would expect to find a justification for this change. However, the revisers gave no such justification; the Commission Staff Comments did not state that there was any change, and therefore gave no reasons for such change. ” (Is Criminal Negligence a Defensible Basis for Penal Liability?, 16 Buffalo L. Rev. 749, 756; emphasis in original.)
The foregoing observations should not be taken, directly or by implication, as any questioning by the court of the wisdom of criminally penalizing negligence. The power and discretion to legislate are vested, as they should be, in the Legislature, and it is this court’s function solely to ascertain, if it can, what is meant and intended by the statute. As the Court of Appeals pointed out years ago: “ It is not a good objection to a statute prohibiting a particular act, and making its commission a public offense, that the prohibited act was before the statute lawful or even innocent, and without any element of moral turpitude. It is the province of the legislature to determine, in the interest of the public, what shall be permitted or forbidden, and the statutes contain very many instances of acts prohibited, the criminality of which consists solely in the fact that they are prohibited, and. not at all in their intrinsic quality. * * .* The justice and wisdom of penal legislation, and its extent within constitutional limits, is a matter resting in the judgment of the legislative branch of the government with which courts cannot interfere.” (People v. West, 106 N. Y. 293, 296 [1887].)
In any event, because the Legislature in 1967 has done precisely what it refused to do in 1828 (ás too harsh) when asked to enact a crime called “ manslaughter in the fourth degree ”, today the words “criminal negligence” have newly-minted meaning and effect. Superficially viewed, the new crime may appear to have the same derivative sources in the precedents of the past. But “long usage has fixed their significance ” (People v. Sohn, 269 N. Y. 330, 334) and the ancient and unbroken continuum of definition and application has so embedded the traditional meaning of ‘ ‘ criminal negligence ’ ’ in the law, that little reflection reveals that the penal tort now designated criminal negligence, (a felony for failure to foresee) is actually not *436 a descendant but, instead, a mutation bearing few, if any similarities. As noted, even the juridical concept of such an offense in this State is totally new.
Regardless of its nomenclature, calling it the same thing does not make it the same thing. In spite of Humpty-Dumpty’s boast to Alice that when he used a word it meant just what he meant it to, it being only a question of who is to be master, one is more convinced by Lincoln’s reminder to a witness that a horse continues to have four legs even if one also calls the tail a leg. As Holmes observed, even a dog knows the difference between being kicked and being tripped over.
Consequently, the existing meaning and scope of criminal negligence having been quite deliberately rejected, the only guidance the past can offer is the general language of the courts when speaking of the- difference between ordinary civil negligence and criminal negligence! We are informed that “ a distance separates the negligence which renders one criminally liable from that which establishes civil liability.” (People v. Rosenheimer, 209 N. Y. 115, 123); or that such negligence goes ‘ ‘ beyond the bounds of lack of skill and foresight where civil liability begins to a point where criminal liability is imposed ” (Brown v. Shyne, 242 N. Y. 176, 183); or that there is required “ something more than the slight negligence necessary to support a civil action for damages.” (People v. Angelo, 246 N. Y. 451, 457). Unfortunately, these benchmarks, useful enough when the meaning of criminal negligence was understood, are no longer sharp or clear enough.
Nor can we seek help from the rule ‘ ‘ that the Legislature is presumed to have had knowledge of the prior judicial construction which has been put upon a term and to have used the term in accord with such construction when it is later employed in a statute which relates to the same general subject matter.” (People v. Gardner, 255 App. Div. 683, 685.)
Unaided then by prior elucidation, the words of section 125.10 and the sections in the law which define and clarify it (art. 15), are what must be examined to evaluate the attack, brought against it as being unconstitutionally vague and obscure.
Criminal negligence as defined in subdivision 4 of section 15.05 requires a failure ‘ ‘ to perceive a substantial, and unjustifiable risk ’ ’ and that such risk be of the nature and degree that1 ‘ the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.” “ Recklessness ”, “awareness of a risk” and a “conscious disregard” thereof are no longer elements. That kind of reckless conduct which was formerly regarded as crim *437 inally culpable negligence has been eliminated both by deliberate omission and specific inclusion in the definition of “ recklessly ” (15.05, subd. 3) which is now the element of another kind of homicide.
Essentially then, one is now criminally negligent if (1) he “ fails to perceive ” a risk; and (2) such failure to perceive is a “gross deviation” from the “standard of care” that a “ reasonable person ” would in that situation “ observe ”. The definition contains ambiguities and numerous unanswered questions. For example, what constitutes a “gross deviation” particularly since it is also employed in the Penal Law’s provision on recklessness? “ The question regarding the defendant’s state of mind is further complicated by the fact that ordinary negligence, the subject of tort liability, does not require a gross deviation. One is left uncertain whether ordinary civil negligence is intended or whether a new species of ‘ negligence ’ is proposed.” (Hall, Negligent Behavior Should be Excluded from Penal Liability, 63 Col. L. Rev. 632, 633).
However, the framers of the legislation did not stop there, and in section 15.10 of the Revised Penal Law, mandated: ‘ ‘ The minimal requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform an act which he is physically capable of performing.” (Emphasis supplied.)
Evident from this qualification in section 15.10 is an apparent reluctance on the part of the Penal Law to penalize a person for his failure to do something which he is not ‘ ‘ physically capable of performing.” How does this affect the liability of the particular defendant when measuring his very specific physical qualities against the average physical capabilities of the average reasonable man? Looking at the word “ perceive ” in the dictionary (it is not defined in the Penal Law) we find that it means, according to ‘ ‘ The Concise Oxford Dictionary of Current English ”, (5th ed., Oxford Univ. Press, 1964), to apprehend with the mind, observe, understand, or “ apprehend through one of the senses, esp. sight.”
If we apply this definition, i.e., apprehending or observing through one of the senses, it is obvious that large masses of people will be immune from the penalties of such conduct as may be prohibited here. For example, the Motor Vehicle Bureau of the State of New York has informed the court that a person who is deaf may obtain an operator’s license and legally drive upon the highways of the State. A deaf operator is neither violating the law in driving, nor is he “physically capable ” of perceiving, i.e., hearing, according to the capabilities of the aver *438 age man. Consequently, one must assume from the language of the statute that if such a driver legally proceeds into an intersection and comes into collision with an ambulance or fire vehicle with sirens on but which he did not hear, and a death results, such conduct would not be criminally chargeable against such a driver, although it would be as to another whose hearing was intact.
Is this not the inescapable interpretation of the words used in the statute, although the court confesses that it finds continuing and considerable difficulty in getting a solid grip on their meaning. The Commission Staff Notes accompanying section 125.10 are not of much help for they simply embellish the statutory definition of criminal negligence without clarifying it. Nor are the Commission Staff Notes under section 15.05: “ The terms •' recklessly ’ and 1 criminal negligence ’ (subds. 3, 4) however, are conceptually more intricate. Here, the section strives especially for precision of definition in an endeavor to crystallize an area of culpability and liability long fraught with uncertainty and confusion. ’ ’ One can only wonder if the irony is deliberate or unconscious.
In trying to think of the acts contemplated by the criminal negligence sections, it is obvious that these are not unlawful acts as such, i.e., mala in se, but rather lawful acts done at a time when the doer commits a perceptual error. Thus, driving in and of itself is not unlawful, but this is not the only otherwise innocent act which would appear to be subject to punishment. The manufacture or distribution of finished goods, if made the subject of a product liability civil suit,- could now, under the blurred standards of the Penal Law, also lead to criminal responsibility, and so, too, with professional malpractice claims. But what of the surgeon who is not “ physically capable ’ ’ of properly performing the surgery at the time; does this enlarge or eliminate his criminal responsibility? The vast scope of criminally punishable conduct could as easily embrace the landowner as well if a child playing in an abandoned building, trespasser though he may be, should injure himself on the property and die. The charge being criminal, contributory negligence would be no defense. (People v. Grogan, 260 N. Y. 138, 149.) Any standard text on torts will unfold many more equally probable examples.
And what of the individual who fails to perceive, but neither accident nor death ensues therefrom. May he, under this law, be held to answer upon a charge of attempted criminally negligent homicide?
*439 Although it has been said, both in the Commission Staff Notes and by our courts, that a long distance separates that negligence on which criminal liability is based from that which establishes civil liability, this distinction was made by our courts at a time when the words “ gross “ culpable ”, “ criminal ” and “ reckless ’ ’ were the equivalent of each other in both meaning and in sense when applied to negligence and when the conscious disregard standard applied rather than that of failure to perceive. Consequently, any distance that may have once existed seems to have been erased.
As frequently as one reads and rereads the sections on culpability so as to reach that minimal understanding which will enable one to offer a guide to a jury, one is persistently driven back to the comment of Justice Leashed Hahd in recalling what William James said about certain passages of Hegel “ that they were no doubt written with a passion of rationality but that one cannot help wondering whether to the reader they have any significance save that the words are strung together with syntactical correctness.” (57 Yale L. J., 167, 169.)
One may try for help in the discussions of the annotators of the Model Penal Code, as much of our new Penal Law is derived from it. (Drafting a New Penal Law for New York — an Interview with Richard Denzer, 18 Buffalo L. Rev. 251, 252.) The definition of criminal negligence in the Model Penal Code is much like ours in the Revised Penal Law. (Model Penal Code, Tentative Draft No. 4, § 2.02[2][d].) While the annotators admit, with commendable candor, that the section as written is incapable of any real clarification, Professor Herbert Wechsler, a member of the staff of the New York Penal Law Bevision Commission which drafted the Bevised Penal Law and a Beporter of the American Law Institute Criminal Law Advisory Committee which drew up the Model Penal Code from which much of the Bevised Penal Law was taken, admonishes in responding to criticism of the legislation: “ Penal law theorists who think that theory is the exposition of the law that is, can hardly ask that legislation be so framed that it will simplify their work.” (63 Col. L. Rev. 589, 593.)
Unfortunately, any such dismissal of “ penal law theorists ” will not do for Judges. The trial bench may neither guess about nor impose its own linguistic colorations upon criminal statutes. There is a jury to charge and, very vitally dependent upon that charge, is the totally nontheoretical question of an individual’s guilt or innocence. Those charged with crime have a nonforfeitable right to insist that legislation be so framed that it will *440 simplify rather than make more difficult their understanding of what it is they must not do.
No less a Jeffersonian than Justice Frankfurter, who was as staunch as Holmes or Hand in upholding the broad power of the Legislature to enact laws free from judicial interference, demanded precision in legislative draftsmanship as an obligation the Legislature owed to a democratic society. He gave the example illustrated in a cartoon of a senator telling his colleagues, 1 ‘ I admit this new bill is too complicated to understand. We’ll just have to pass it to find out what it means ”; and went on to say, “In a democracy the legislative impulse and its expression should come from those popularly chosen to legislate, and equipped to devise policy, as courts are not. The pressure on legislatures to discharge their responsibility with care, understanding and imagination should be stiffened, not relaxed.- Above all, they must not be encouraged in irresponsible or undisciplined use of language. ’’ (Some Reflections on the Reading of Statutes, published in Essays on Jurisprudence from the Columbia Law Review, pp. 61, 62 [Col. Univ. Press, 1963],)
However, instead of precision, we are faced with language so obscure that the drafters and annotators of the Model Penal Code literally throw up their hands when asked to resolve the question of what acts would be included in this 1 ‘ new species of negligence ”.
“ There is no way to state this value-judgment ” they admit “ that does not beg the question in the last analysis-, the point’ is that the jury must evaluate the conduct and determine whether it should be condemned. The draft, therefore, proposes that this difficulty be accepted frankly and the jury asked if the defendant’s conduct involved ‘ culpability of high degree.’ The alternative suggested asks if it £ involves a gross deviation from proper standards of conduct.’ This formulation is designed to avoid the difficulty inherent in defining culpability in terms of culpability, but the accomplishment seems hardly more than verbal; it does not really avoid the tautology or beg the question less. * * *
“ The fourth kind of culpability is incompetence. It is distinguished from acting purposely, knowingly or recklessly in that it does not involve a state of awareness. It is the case where the actor creates inadvertently a risk of which he ought to be aware, considering its nature and degree, the nature and the purpose of his conduct and the care that would be exercised by a reasonable person in his situation. Again, however, it is quite impossible to avoid tautological articulation of the final question. * # *
*441 “A further point merits attention: the draft invites consideration of the ‘ care that would be exercised by a reasonable person in his [i.e. the actor’s] situation,’ There is an inevitable ambiguity in ‘situation’.” (Model Penal Code Tent. Draft No. 4, 1955, § 2.02, Comment 3, at pp. 125-126; emphasis supplied.)
The frankly admitted existence of ‘ ‘ tautological articulation “ inevitable ambiguity ” and “ beg[ging] the question ” where clarity is essential and confusion abhorrent is precisely the kind of draftsmanship which invites speedy burial. The contrast with the deliberate and painstakingly evolved definition of criminal negligence previously developed by the courts is too striking to be ignored. There is neither excuse nor justification for such legislative obscurity and small comf ort, if any, in telling a man that although he has been convicted for a loosely defined perceptual error, he is not being punished quite so severely as other homicides. Standards for a crime so new in concept and application should be articulated with precision and care. Instead, we have a definition of culpability ‘ ‘ that would * * * be the envy of those monastics whose hitherto favorite pastime had been debating the number of angels who might dance on the head of a pin.” (Kuh, A Prosecutor Considers the Model Penal Code, 63 Col. L. Rev. 608, 621.) A Kuh points out (p. 622): “ If the draftsmen wish to force trial judges to stop and puzzle o /er abstruse wording, that discipline can do no harm. But the trouble is that the draftsmen are here engaged in linguistic embroidery to which lay jurors would inevitably be exposed. This worries me — and I do not derogate from the individual abilities of lay jurymen. But awkward phrases and shrouded concepts bother me; for instructions in the law— jury charges — are delivered to jurors orally and may go on for hours. Furthermore, they may contain a variety of precepts with which the jurors have never before had to deal, and concerning which, if a verdict is to be reached, the jurors must all end up as of one mind, convinced beyond a reasonable doubt.”
The situation is made even more difficult by the fact that we are dealing with a penal statute creating a new offense and its language does not employ words or phrases, in the context in which they are used, which have a well-settled meaning at common law. ‘ ‘ Neither accepted norms of conduct nor common-law traditions of customary diligence give definiteness and significance to the acts to be avoided.” (People v. Mancuso, 255 N. Y. 463, 471; see, also, People v. Gardner, 255 App. Div. 683, 684.)
*442 There can be no expectation that a jury will, with reasonable uniformity and consistency, be able to “ evaluate the conduct and determine whether it should be condemned It is asking too much of the fact-finding process not to determine if an act was or was not done, but to select which acts are crimes and which are not. Such vast discretion in a jury would change its power from fact-finding to law-making. However, “we must not leave it for the judge or jury to guess at; we are .obliged to tell them something as a guide and not leave a man’s conduct to be judged solely by the whim of the hour ” (People v. Grogan, 260 N. Y. 138, 147); furthermore, “the criminality of an act cannot depend upon whether a jury may think it reasonable or unreasonable. There must be some definiteness and certainty.” (People v. Charles Austin, Inc., 301 Mich. 456, cited in Clark and Marshall, A Treatise on the Law of Crimes ([7th ed.], § 1.06, n. 56); and above all that ‘“a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it * * * leaves judges and juries free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case. ’ (Giaccio v. Pennsylvania, 382 U. S. 399, 402-403.) * * * The vice of a vague provision lies precisely in its failure to give fair warning before it is sought to be invoked.” (Friedman v. State of New York, 24 N Y 2d 528, dissenting opn. at p. 545.)
The evil in a law which does not give us clear boundaries to mark out the area of prohibited conduct nor the standards by which it is to be measured, is the hazard that results by not having notice of what the law requires and being unable, therefore, to plan one’s conduct accordingly. Not to know with some reasonable degree of certainty whether one’s conduct is legal or criminal until after the event, is, in a very real sense, violative of the constitutional prohibition against ex post facto punishment. (U. S. Const., art. I, § 9, cl. 3.) In addition, it is essential that those in charge of the initial criminal process, the police and prosecutors, be given that direction and such discretion as come from reasonably explicit guidelines. (Packer, The Limits of the Criminal Sanction, Stanford Univ. Press, 1968, pp. 79-95.)
‘ ‘ Under the vagueness doctrine in its starkest form, the court says to the legislature: You have given so much discretion in picking and choosing among the various kinds of conduct to which this statute may be applied that we will not let it be applied at all ” (pp. 93-94); or, as stated by the United States Supreme Court, ‘1 The vice of vagueness in criminal statutes is the treachery they conceal either in determining what persons *443 are included or what acts are prohibited. Words which are vague and fluid * * * may be as much of a trap for the innocent as the ancient laws of Caligula.” (United States v. Cardiff, 344 U. S. 174, 176.)
The court is aware of the language in Nash v. United States (229 U. S. 373, 377) by Justice Holmes that “ the law is full of instances where a man’s fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree.” However, this was said in upholding the Sherman Anti-Trust Act as against the contention that its condemnation of unreasonable restraint of trade was too vague. However, the Sherman Act developed from the existing common law with respect to restraint of trade and therefore one was able to make a reasonable estimate, based upon earlier landmarks, whether or not the trade practice contemplated was legal. However, other statutes imposing criminal penalties and which had not acquired definiteness from prior law or judicial construction, have been struck down for vagueness; for example, the price control statute making it a crime to make any unjust or unreasonable rate or charge for “ necessaries ” (United States v. Cohen Grocery Co., 255 U. S. 81); imposing a criminal penalty on contractors paying employees ‘ ‘ less than the current rate of per diem wages in the locality where the work is performed ” (Connally v. General Constr. Co., 269 U. S. 385, 388); defining “ gang ” as “ consisting of two or more persons ” and making it a crime to be a “gangster” (Lanzetta v. New Jersey, 306 U. S. 451); prohibiting “ harsh ” or “ unkind ” treatment of a mentally ill person (People v. McCaughan, 49 Cal. 2d 409); prohibiting an abortion 11 unless the same is necessary to preserve her life ” (People v. Belous, 80 Cal. Rep. 354, 357); punishing “ any person who does any act which manifestly tends to cause any child to become a delinquent child ” (State v. Hodges, 457 P. 2d 491, 492 [Ore.]).
Probably one of the most recent and clearest statements on this subject was made by our Court of Appeals in People v. Firth (3 N Y 2d 472, 474) in declaring that the prohibition against driving “ at such a speed as to injure the life, limb or property of any person ” was meaningless as worded. The court, per Judge Desmond, stated (p. 474): “ Our question, then, is whether this statute satisfies the requirement that a criminal statute must be sufficiently definite, ‘ clear and positive ’ to give ‘ unequivocable warning ’ to citizens of the rule which is to be obeyed (see cases cited in People v. Vetri, 309 N. Y. 401, 405-406). * * * One could go further and say that the statutory verbiage is practically meaningless. We may guess at what the *444 draftsman intended and, indeed, as we shall show in a later paragraph, there is material available to show what was intended. Bnt that is not sufficient. For validity, the statute must be informative on its face.” (Emphasis supplied.)
As one court put it, “ Penal statutes should be clear and unambiguous so that he who runs may not only read but understand.” (People v. Pestronk, 3 Misc 2d 845; cf. Trio Distr. Corp. v. City of Albany, 2 N Y 2d 690; 9 N. Y. Jur., Constitutional Law, § 335, pp. 227-228; 56 N. Y. Jur., Statutes, § 254, pp. 703-704.)
Because the prohibition with respect to criminal negligence is shrouded in such vague and general terminology, and there has been no course of prior judicial construction to enable the man of common intelligence to be reasonably informed as to what is required of him, those who are subject to its terms must necessarily guess as to its meaning and application. The end result, therefore, depends upon the particular hues and attitudes of juries who, like the varying hare, may change their coloration with each new season. This represents ad hoc legislation at its worst and, at its best, ought not to be encouraged.
Even those academically trained and equipped for such an esoteric task as the'interpretation of legislative language reflect uncertainty when dealing with it. For example, at the conference of Supreme Court Trial Justices held in 1966, Professor Herman Schwartz of the State University of New York at Buffalo School of Law, reported, as an example of criminal negligence, a defendant who- does not know his brakes are poor and drives 35 miles per hour in a relatively crowded area. 11 He should have known his brakes were not good and his unawareness of this risk may be deemed criminally negligent if a sufficient deviation from reasonable behavior. ’’ (Twelfth Annual Report, Judicial Conference, 1967, p. 109; emphasis supplied.)
However, the Third Department, in People v. Taylor (31 A D 2d 852) rejected such a broad interpretation in a case where a defendant was indicted for manslaughter, second degree and convicted of criminally negligent homicide. Although there was “ample evidence” of negligence and carelessness, including drinking and speed, the court emphasized that these, standing alone, are not sufficient to convict for either manslaughter or criminally negligent homicide. It then went on to interpret the criminal negligence section in such a way as to drastically re-legislate it. “ The proof required for a criminal conviction under these sections of the new Penal Law remains as set forth in People v. Eckert (2 N Y 2d 126, 130, 131): ‘ As the terms signify, this conduct arises when the actor has knowledge of the highly dangerous nature of his actions or knowledge of such *445 facts as under the circumstances would disclose to a reasonable man the dangerous character of his action, and despite this knowledge he so acts (p. 853). In reversing the conviction, the Third Department specifically concluded that passing a red blinking light without stopping was not a failure to perceive the risk.
In People v. Haney (59 Misc 2d 162, 164) Justice Aaron E. Koota pointed out that, “this dichotomy in classification of vehicular homicide thus separates passive or negative negligence (failure to perceive a substantial risk, etc.) from the more aggravated degree of recklessness.” He nevertheless felt obliged to dismiss an indictment charging defendant with criminally negligent homicide who operated a vehicle at an excessive rate of speed past a red light and struck and killed a pedestrian.
It appears, at least from these two cases, that the definition of criminal negligence is now the same as it was prior to the Revised Penal Law, requiring gross and culpable conduct indicating a knowing disregard of the consequences, i.e., recklessness; and that the “conscious disregard” standard again applies.
But this is obviously not what the Legislature intended. However unclearly the Legislature may have defined ‘ ‘ criminal negligence ”, it is quite clear that a definite distinction was made in the new Penal Law between ‘ ‘ recklessness ’ ’ and ‘ ‘ criminal negligence ’ ’. They are separately set forth and marked out. They are defined and applied differently. The statute demonstrates a deliberate purpose to make them different. Indeed, the Law Revision Commission notes say so. The statute must be construed in its entirety and as a whole (56 N. Y. Jur., Statutes, § 201); it must be taken as it is written and should not be retouched into constitutional proportions. (People v. Firth, 3 N Y 2d 472; People v. Lewis, 13 N Y 2d 180.) It is therefore difficult to perceive, in reason or necessity, how the status of ‘ ‘ criminal negligence ’ ’ can be preserved simply by erasing that difference and recasting it in the broken mold. Section 125.10 and its satellite sections in article 15 must stand or fall on their own.
The constitutional question that has been raised here is, consequently, one that must be seriously considered. It is undoubtedly apparent that this court’s view of the constitutional validity of section 125:10 is questionable to say the least. What deters it from now acting upon these doubts is recognition of the fact that the two cases dealing with section 125.10, one of which was on the appellate level, refrained from handling the constitutional question but dealt directly with the law on a sub-
*446 stantive level. (People v. Taylor, 31 A D 2d 852, supra; People v. Haney, 59 Misc 2d 162, supra.) In fact, the Third Department in Taylor made specific reference to the fact that it was not dealing with the other questions raised on the appeal; although Point III of the appellant’s brief attacked section 125.10 and section 125.15 (manslaughter, second) as unconstitutional for being vague and indefinite and failing to prescribe specific criminal acts (pp. 13-17 of appellant’s brief, bound Record on Appeal, Appellate Division, Fourth Department Library).
Further, in two other cases decided by the Appellate Division, Third Department, relief was denied when the constitutionality of this same statute was raised on pretrial motions attacking the indictment charging criminally negligent homicide. (Matter of Rossi v. County Court of County of Schoharie, 31 A D 2d 715; Matter of Madelone v. County Court of County of Schoharie, 31 A D 2d 716.)
In the Matter of Rossi (31 A D 2d 715, 716, supra) the Appellate Division said: 1 ‘ Other remedies are available to petitioner and since, in our view, the statute is not on its face unconstitutional, petitioner has failed to show a clear legal right to the relief requested.” Motions for stays in Rossi and Madelone have since been denied by the Court of Appeals. (23 N Y 2d 921 and 922.) *
There is a further reason why a decision on the constitutional question is withheld at this time, and that is the possibility of this case being disposed of in another way. A constitutional case should not be decided where the decision may be rested upon an alternative ground. (Matter of Peters v. New York City Housing Auth., 307 N. Y. 519, 527, 528; Matter of Keogh v. Wagner, 20 A D 2d 380, affd. 15 N Y 2d 569.)
The defendant, in addition to the other relief sought, also attacks the sufficiency of the indictment. The indictment reads: “ The defendant, on or about August 16, 1968 at the Town of Penfield, Monroe County, with criminal negligence feloniously caused the death of Rodney Steurrys. ” Whether the indictment is in long form (Code Crim. Pro., §§ 275-295) or simplified (Code Crim. Pro., §§ 295-a-295-l) is not clear from its face, but this question need not detain us because the People, in their brief concede that it is a so-called short-form indictment. This is the same as a simplified indictment. (People v. Burke, 30 *447 A D 2d 252, affd. 24 N Y 2d 852.) Both the moving papers and the brief of defendant’s counsel indicate a readiness to accept this view. Accordingly, the questions as to its adequacy as a long-form indictment, the necessity for a bill of particulars, as well as the particulars which the defendant requests in his third motion are, for the moment, reserved and. the inspection by the defendant of the Grand Jury minutes is hereby ordered pursuant to People v. Burke (supra).
Decision is reserved with respect to the present motions until such time as the defendant has had an opportunity to examine the Grand Jury minutes and has made such other application with respect to the indictment as he may deem appropriate.
The People shall furnish defendant’s counsel with a copy of the minutes of the Grand Jury testimony forthwith.

In his brief, defendant argues that all the Appellate Division said in the Rossi and Madelone eases is that a denial of an order of prohibition, (an article 78 .proceeding being the means used to attack the statute) was discretionary and would not be disturbed on appeal, and that other remedies were available; that, therefore, the question of the constitutionality of section 125.10 remains undecided.