Jesse KETCHUM, M. D., Petitioner,

v.

Benjamin WARD, Commissioner of the Department of Correctional Services of the State of New York, et al., Respondents.

No. Civ–75–79.

United States District Court,
W. D. New York.

Nov. 5, 1976.

**936**

Roy Lucas, Washington, D. C., Carlisi, Carlisi & Trafalski, Buffalo, N. Y., for petitioner.

Edward C. Cosgrove, Dist. Atty. of Erie County, Buffalo, N. Y. (Judith Blake Manzella, Buffalo, N. Y., of counsel), for respondent Cosgrove.

CURTIN, Chief Judge.

This is an application for a writ of habeas corpus by the petitioner, Dr. Jesse Ketchum, who was convicted of criminally negli-

gent homicide on October 26, 1973, in Erie County Supreme Court, as a result of the death of a patient upon whom he had performed an abortion.[1] The conviction was affirmed without opinion by the Supreme Court, Appellate Division, Fourth Department. *People v. Ketchum,* 45 App.Div.2d 820, 358 N.Y.S.2d 353 (4th Dept. 1974). That order was affirmed by the New York Court of Appeals. *People v. Ketchum,* 35 N.Y.2d 740, 361 N.Y.S.2d 911 (1975). Application for a writ of certiorari was denied by the United States Supreme Court on February 18, 1975, 420 U.S. 928, 95 S.Ct. 1127, 43 L.Ed.2d 399 (1975).

■ The petitioner argues that his conviction should be reversed for nine different reasons. [Amended Petition, ¶¶ 46(A)–(I)].[2] In a footnote, the petitioner indicates that he does not wish to argue five grounds in this action,[3] and the respondent properly points out that these arguments or their "substantial equivalent[s]" have never been raised in state courts. *Picard v. Connor,* 404 U.S. 270, 275, 277, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); 28 U.S.C. § 2254(b).

The circumstances that gave rise to this prosecution can be outlined in the following manner. Margaret Louise Smith, a twenty-five year old Michigan woman who had been advised of the possibility of having been exposed to rubella in the earlier stages of her pregnancy, traveled to Buffalo, New York for the purpose of obtaining an abortion. Billy Ray Ellenburg, her companion for over a year and a half, accompanied her to Buffalo. On June 16, 1971, Ellenburg and Mrs. Smith arrived at the petitioner's office at 9:30 a. m. Ellenburg left almost immediately and the surgical procedure was

---

1. Penal Law § 125.10 reads as follows:

 § 125.10 Criminally negligent homicide
 A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person.
 Penal Law § 15.05(4) reads as follows:
 § 15.05(4) "Criminal negligence." A person acts with criminal negligence with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circum-

 stance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

2. Because the court directed an expedited briefing schedule, respondents Ward, et al. did not submit an answer. The court will deem respondents' brief to be an answer for purposes of this action.

3. Petitioner's Brief, n. 1.

performed at approximately 10:30 a. m. Mr. Ellenburg returned for thirty to forty minutes at noon and again at two o'clock. Mrs. Smith was pale and had a difficult time breathing on both of his visits. Upon his second visit, he urged the office personnel to check Mrs. Smith and Dr. Ketchum summoned a rescue squad, which attempted to resuscitate Mrs. Smith when they found there were no life signs. She was taken across the street to the hospital, where she was pronounced dead on arrival. A pathologist who performed the autopsy concluded that the cause of death was hemorrhaging from the tear in the uterus and cervix.

The petitioner admitted to the Erie County Medical Examiner that he had performed a vaginal hysterotomy, which consists of an incision in the cervix and manual extraction of the fetus. There was testimony at the trial from doctors that vaginal hysterotomy was not a commonly used method of abortion, especially at the stage of pregnancy that the victim had reached, was somewhat dangerous and more properly considered major medical procedure of the type normally performed only in a hospital. The petitioner offered a witness who, after reviewing photographs of the victim's uterus, concluded that a vaginal hysterotomy had not been performed, and another defense witness testified that an amniotic fluid embolism coupled with pulmonary disease and hemorrhaging were the possible causes of the death of the victim. An amniotic fluid embolism occurs when the waterlike fluid surrounding the fetus and particles in it enter the circulatory system and cause obstruction of the blood flow (embolism), which can be fatal by restricting blood flow in the lungs and by making the blood less able to coagulate. The pathologist who performed the autopsy testified that he examined all the sections of the victim's lungs and did not find any evidence of amniotic fluid.

Testimony from Mr. Ellenburg and a receptionist employed by the petitioner indicated that the post-operative care provided to Mrs. Smith was minimal and that no one of the petitioner's staff even entered the room for the forty-five minutes to one hour that Mr. Ellenburg was with Mrs. Smith. Even the defense witnesses indicated that periodic checks (i. e., at fifteen to thirty minutes intervals) of the patient's appearance, vital signs, breathing, blood pressure and pulse are normal aftercare.

This is a partial explication of the evidence that was before the jury. Other significant portions of the testimony will be described when relevant.

■ The petitioner argues that the criminally negligent homicide statute [NYPL § 125.10], as invoked in a surgical death case involving a legal abortion in 1971, was unconstitutionally applied to his case because the statutory language, legislative history and case law provided no notice of preexisting standards, elements of the offense charged, or acts or omissions said to be illegal, but allowed the prosecutor, judge and jury to adopt whatever theories they should choose according to the developments of the testimony. The respondent contends that these arguments based upon the due process requirement of fair advance warning of proscribed conduct, although presented to the state trial and appellate courts, were not decided by the state courts. The respondent concludes that the failure to decide the constitutional issues on the merits precludes this court from considering them. However, the respondent argues too much. It is agreed that the petitioner has challenged the constitutionality of the statute as applied. The failure of the state courts to use more than a few short sentences in denying the petitioner relief does not preclude this court from proceeding to the merits of these arguments, which were properly presented in state courts. *Picard v. Connor, supra; see Peyton v. Rowe,* 391 U.S. 54, 56 & n. 2, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968); 28 U.S.C. § 2554(b). The petitioner also argues that prosecutorial misconduct at trial was so great that it violated his right to a fair trial.

The indictment accused Dr. Ketchum in this manner:

Criminally Negligent Homicide, in that he, the said JESSE KETCHUM, on or

about the 16th day of June, 1971, in the County, with criminal negligence, caused the death of Margaret Louise Smith by his choice of a surgical procedure, to wit: a vaginal hysterotomy, under all the circumstances of this case and by failing to care for and provide for her proper medical care, after that procedure was utilized. *People v. Ketchum, supra,* Record on Appeal [hereinafter R.], Vol. I at 5.

The statute, NYPL § 125.10, enacted in 1967, which makes an act criminal when one "fails to perceive a substantial and unjustifiable risk," must, as the commentary indicates, be considered "at least partially new." NYPL § 125.10 Practice Commentary (McKinney 1975). The 1909 Penal Law defined criminal negligence, used interchangeably with the term "culpably negligent," as ". . . any unlawful, negligent *or* reckless act . . . ." NYPL § 1052(3) (1909) (emphasis added). However, the New York Court of Appeals construed that to mean a "disregard of the consequences which may ensue from the act, *and* indifference to the rights of others." *People v. Angelo,* 246 N.Y. 451, 457, 159 N.E. 394, 396 (1927) (emphasis added). While the words of the statute indicate that "negligent" acts could be indictable, the court imparted the requirement that the actor be aware that his action might produce harm, *i. e.,* "disregard of the consequences." The harshness of punishing negligent conduct was ameliorated by requiring the conduct to approach "recklessness" before criminal sanctions be imposed. *People v. Waxman,* 232 App.Div. 90, 249 N.Y.S. 180 (1st Dept. 1931); Note, 16 Buff.L.Rev. 749, 753 (1967). In 1936, the negligent homicide statute was amended to add the vehicular homicide law. Former NYPL § 1053–a (1909). The terminology of § 1052 seemingly placing liability on an alternative basis ("reckless *or* culpably negligent") was repeated in § 1053–a. Again, however, the

courts made "reckless" conduct the minimal basis for liability. *See People v. Decina,* 2 N.Y.2d 133, 157 N.Y.S.2d 558 (1956); *People v. Gardner,* 255 App.Div. 683, 8 N.Y.S.2d 917 (4th Dept. 1939). However, in 1967, the new Penal Code made such judicial construction impossible by placing reckless homicide and negligent homicide in different statutory sections. *Cf.* NYPL §§ 15.-05(3), (4), 125.05, 125.10. Such a bold modification in the law has not gone without academic and judicial comment. *See People v. Buffington,* 61 Misc.2d 429, 304 N.Y. S.2d 746 (Monroe County Court, 1969); Hall, *Negligent Behavior Should Be Excluded From Penal Liability,* 63 Col.L.Rev. 632 (1963); Note, 16 Buff.L.Rev. 749, 753 (1967). While there are academic and theoretical difficulties not of constitutional proportions with making less than reckless conduct punishable, the petitioner's challenge rests upon constitutional grounds.

The problem is that negligence, by definition less than intentional conduct, is usually a question for the jury.[4] The petitioner argues that the terms of the statute are vague and that leaving this determination to the jury results in criminal sanctions being applied with inadequate notice. In addition, he argues that the possibility of such a *post hoc* deliberation leaves the court, and the defense attorney, without adequate guidelines for trial purposes. Thirdly, the petitioner argues that since there were no statutory guidelines or standards codified in the area of abortions performed in offices, the jury could not find that his conduct was a gross deviation from a non-existent standard.

To buttress this last point, the petitioner contends that the Supreme Court decisions in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) [applied retroactively in light of *United States ex rel. Williams v.*

---

4. As the New York Court of Appeals phrased it:

No one is deemed to have committed a manslaughter only because he has caused the death . . . of another by negligence which is not culpable. What amount of negligence can be

called culpable is a question of degree for the jury, depending on the circumstances of each particular case.
*People v. Angelo,* 246 N.Y. 451, 454, 159 N.E. 394, 395 (1927).

*Preiser,* 497 F.2d 337 (2d Cir. 1974), *cert. den.,* 419 U.S. 1058, 95 S.Ct. 642, 42 L.Ed.2d 655 (1974)], established abortion as a "presumptively privileged" act and, as a result, the state could not, and did not, establish such standards. He argues that prosecution of him in this privileged area is therefore precluded. As extensive as the *Roe* and *Doe* decisions were, the Supreme Court did not establish the patient's right to privacy and the physician's right to practice to such an expansive degree that all state regulation of the abortion decision and its performance is precluded. In *Roe,* the Court ruled that up to the end of the first trimester of pregnancy, "the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician." *Roe v. Wade, supra* at 164, 93 S.Ct. 705. However, the Court continued and noted:

> Up to those points [the end of the first and second trimesters of pregnancy], the abortion decision in all its aspects is inherently, and primarily, a medical decision, and basic responsibility for it must rest with the physician. If an individual practitioner abuses the privilege of exercising proper medical judgment, the usual remedies, judicial and intra-professional, are available. *Id.* at 166, 93 S.Ct. at 733.

■ Further, the petitioner cites *Doe* for the contention that criminal prosecution of a doctor is precluded since, if a physician is licensed by a state, "he is recognized by the State as capable of exercising acceptable clinical judgment." *Doe v. Bolton, supra* at 199, 93 S.Ct. at 751. However, that language was in response to the Georgia stat-ute's requirement that the decision of the pregnant woman's physician that an abortion was necessary had to be confirmed by two other Georgia-licensed physicians. *Id.* The language must be read to mean that the state's licensing of a doctor leads only to the presumption that he is capable of exercising "acceptable clinical judgment" in deciding whether an abortion is necessary.

■ The petitioner contends that "Federal constitutional law today is that at least first trimester abortions are so safe as to be constitutionally protected in the physician's office or clinic." (Brief at 37). While it is arguable that this is a correct statement of the law, this court need not decide whether it is. All the testimony at trial as to the length of the victim's pregnancy (with the exception of Dr. Vuitch, who estimated the period from photos of the uterus) was to the effect that the period of gestation was fifteen weeks or more—well into the second trimester.[5] The petitioner himself told a police officer who questioned him on the scene that the victim was eighteen weeks pregnant. (R., Vol. II at 221). The court rules that the abortion took place in the second trimester of pregnancy. Even making *Roe* and *Doe* fully retroactive does not support the petitioner's argument that he was engaged in a constitutionally protected area immune from prosecution for his acts. The Supreme Court summarized the matter in this fashion:

> For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses,

5. Dr. James O'Day, a general practitioner in the victim's home state, testified she was fifteen to sixteen weeks pregnant 28 days before the abortion. (R., Vol. I at 202). He allowed a two-week period of error. (R., Vol. I at 206). Billy Ray Ellenburg, a friend of the victim, testified he felt several movements in the victim's stomach which were similar to those he had felt previously in a pregnant woman. (R., Vol. I at 408–09). A doctor testified such movement could not be felt until at least the sixteenth week of pregnancy. (R., Vol. I at 246, 254–55).

Dr. Sal Messinger, the pathologist who conducted the autopsy, testified that the victim was four and one-half to six months pregnant. (R., Vol. II at 1148). Dr. Rereza Mafee, a general practitioner who examined the victim, testified she was from fifteen to eighteen weeks pregnant with a two-week margin for error. (R., Vol. III at 1439). Dr. Milan Vuitch, an obstetrician and gynecologist, estimated the period of gestation from photos of the uterus removed from the body as being from twelve to fourteen weeks. (R., Vol. III at 1488). The fee charged the victim, $500, was the amount charged for abortions in the fourteenth to sixteenth week range. (R., Vol. I at 442, 469–70).

regulate the abortion procedure in ways that are reasonably related to maternal health. *Roe v. Wade, supra* at 164, 93 S.Ct. at 732.

The Court recognized the state's legitimate interest in protecting the mother in second trimester abortions and the prosecution of Dr. Ketchum was proper under *Roe v. Wade, supra.*

In 1974 the Second Circuit Court of Appeals invalidated a 1966 conviction of a New York physician for abortion manslaughter under former Penal Law § 1050. There the court recognized *in dicta* that physicians were not necessarily completely free from criminal liability for even first trimester abortions (the victim was in her second month of pregnancy). *United States ex rel. Williams v. Preiser, supra* at 337. The court ruled:

> If licensed physicians have a constitutional right to perform *non-negligent,* consensual abortions without fear of prosecution, Dr. Williams cannot remain deprived of liberty for having done so. *United States ex rel. Williams v. Preiser, supra* at 339. (Emphasis added).

In the *Williams* case, a medical examiner testified that the operation was perfectly performed and, although the doctor did not call an ambulance until hours after the death, the state had "not shown that negligence in this respect prevented the patient from being resuscitated." [6] *Id.* at 338.

The petitioner's argument that this court should apply a stricter standard of review in this allegedly privileged area cannot be accepted, for that standard is restricted for statutes which involve first amendment freedoms and is inappropriate here. *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975); *Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *see United States v. Dennis,* 183 F.2d 201, 215 (2d Cir. 1950).

The petitioner argues that the statute under which he was prosecuted and convicted is so vague and so lacking in definition that it fails to specify what conduct it prohibits and is violative of the due process clause. The repeatedly quoted phrase that characterizes this argument is:

> [A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essentials of due process of law. *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

But this ruling is somewhat tempered in application, as the Court said there:

> . . . the decisions of the court upholding statutes as sufficiently certain [in other cases], rested upon the conclusion that they employed words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them . . . or a well-settled common law meaning, notwithstanding an element of degree in the definition as to which estimates might differ.
>
> *Id.* at 391, 46 S.Ct. at 127 (citations omitted).

No doubt the terms of the statute (*e. g.,* "negligence," "fails to perceive a substantial and unjustifiable risk," "a gross deviation from the standard of care that a reasonable person would observe") have a wealth of common law meaning.

While the newness of making such negligent conduct the object of criminal sanctions may not result in a plethora of recent criminal law sources from which to draw meaning, understanding of the terms can be gained from the civil side of the law. The language of the Supreme Court in *Cline v. Frink Dairy Co.,* 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146 (1927), is directly on point:

> It is true that, on an issue like negligence, i. e., a rule of conduct for the average man in the avoidance of injury to his neighbors, every one may be held to observe it either on the civil or criminal side of the court. It is a standard of human

---

**6.** Indeed, under old NYPL § 1050, the State need not prove negligence to obtain a conviction. *Cf.* NYPL § 125.10 Criminally Negligent Homicide.

conduct which all are reasonably charged with knowing and which must be enforced against every one in order that society can safely exist. We said in the *Nash* case [*Nash v. United States,* 229 U.S. 373, 377, 33 S.Ct. 780, 57 L.Ed. 1232 (1913)], "But apart from the common law as to restraint of trade thus taken up by the statute the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. . . ."
*Cline v. Frink Dairy Co., supra* at 464, 47 S.Ct. at 687.

◼ Fundamental fairness no doubt requires that an individual be given the opportunity to discover a statute's existence, applicability and meaning. Not every layman will read the Penal Code from cover to cover. But, if the statute in question is either clear in meaning upon reading, or sufficient to warn the layman that he should seek legal advice as to its applicability and meaning, it is proper to charge the potential violator with such knowledge of a law's applicability as he could obtain through competent legal advice. Note, 62 Harv.L.Rev. 77, 80 (1948). If a competent lawyer is consulted, he should be able to predict whether the statute might be used as a basis for prosecuting his client. If the words of the statute and other related law make it impossible to make such a prediction, a statute comes close to inadequate advance notice. Of course, in this particular case, it is patently improper to hold that the inability of a lawyer to predict the jury deliberation of the question of negligence is the basis for ruling lack of adequate notice.[7] For it is not the duty of the legislature or the courts to advise defendants of the likely reaction of juries in the areas in which defendants engage in business. *United*

*States v. Frew,* 187 F.Supp. 500, 507 (E.D. Mich.1960).

◼ The petitioner emphasizes in his lack-of-notice argument that he was the first physician to be indicted and convicted under the statute. However, the reality of the situation is that before the effective date of the liberalized abortion law [NYPL § 125.05(3)(b)], the state had little reason to prosecute physicians under the negligent homicide statute. Prior to that date, the abortion manslaughter statute was a more suitable vehicle for such prosecutions. Former NYPL § 1050, superseded in 1967 by former NYPL § 125.20(3). *See United States ex rel. Williams v. Preiser, supra* at 338 n. 3. The Supreme Court has recently noted that prior application of a criminal statute to identical conduct is not a prerequisite to a statute's withstanding constitutional attack. *Rose v. Locke,* 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975) (per curiam). (Two of the dissenters agree with the majority in this proposition. *Id.* at 58, n. 1, 96 S.Ct. 243).

◼ A determination of whether a statute provides adequate warning to potential violators must be made ". . . on the basis of the statute itself and the other pertinent law, rather than on the basis of an *ad hoc* appraisal of the subjective expectations of particular defendants." *Bouie v. City of Columbia,* 378 U.S. 347, 355–56 n. 5, 84 S.Ct. 1697, 1704, 12 L.Ed.2d 894 (1964). The criminal negligence statute provides sufficient warning to those people who intend to engage in activities which might produce injury or death in that those people are properly chargeable with the knowledge and forewarning that competent legal advice could provide. A competent attorney, after reading the statute and reflecting upon the common law meaning of its terms which are in general usage on the civil side of the court, could *not* advise a physician that he would not be indicted or found guilty by a jury for performing an abortion

7. As the Supreme Court phrased it:
The mere fact that a penal statute is so framed as to require a jury upon occasion to determine a question of reasonableness is not sufficient to make it too vague to afford a practical guide to permissible conduct.
*United States v. Ragen,* 314 U.S. 513, 523, 62 S.Ct. 374, 86 L.Ed. 383 (1942).

which led to the death of the mother. *Connally v. General Construction Co., supra; Jordan v. DeGeorge*, 341 U.S. 223, 231, 71 S.Ct. 703, 95 L.Ed. 886 (1951). Similarly, such common law guidance to the meaning of the statute provides a sufficient guide to the judge and defense attorney at trial. The court rules that the statute as applied provided the petitioner with sufficient notice of the acts or omissions that might be subject to criminal prosecution. The petitioner can be properly charged with such notice because a reading of the statute provides the average man with a warning that he should seek competent advice concerning the likelihood of his prosecution and conviction under the statute.

The second part of petitioner's argument concerning notice is that he had no notice of preexisting standards of care. There were no codified, statutory standards specifically governing office abortions at the time in question. The petitioner argues that his prosecution was an effort to invent standards where there were none before, and to incorporate such standards into a felony criminal statute. This argument has been made in the state courts and consideration of it here is appropriate.

While the grand jury that indicted the petitioner was concerned about the absence of standards within the statute permitting abortions upon request in early stages of pregnancy (Report of Grand Jury, Petitioner's Brief, N. Y. Court of Appeals, 48–49), the grand jury misunderstood the nuances of a criminal negligence law. Negligence is not an easy concept to grasp, and the idea of a standard of conduct can be a confusing one. As long as negligence has existed, this difficulty has existed.

> The whole theory of negligence presupposes some uniform standard of behavior. Yet the infinite variety of situations which may arise makes it impossible to fix definite rules for all conceivable human conduct. The utmost that can be done is to devise something in the nature of a formula, the application of which in each particular case must be left to the jury, or to the court.

Prosser, Law of Torts, § 32 at 150–51 (4th Ed. 1971).

One of the prosecution experts, Dr. Dean Goplerud, testified at trial that the State Medical Society had presented rules and guidelines to the New York Legislature while it was considering the new abortion law, but that the Legislature chose not to include them in the law itself. (R., Vol. II at 788). Professor Prosser would no doubt agree with such a choice. He notes that "[s]ince it is impossible to prescribe definite rules in advance for every combination of circumstances which may arise, the details of the standard must be filled in in each particular case." Prosser, *supra* § 37, at 207. The petitioner argues that without a statutory standard of conduct, there is vagueness and insufficient notice. But the Supreme Court has ruled that this is not necessarily the case:

> The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.

*Colten v. Kentucky*, 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972).

At trial, the prosecution admitted that the standard of care was not codified and then presented doctors specialized in the field of gynecology, who testified as to the methods of practice in general use for an operation like the one the petitioner had performed.[8] There was sufficient evidence

---

8. *Pike v. Honsinger*, 155 N.Y. 201, 49 N.E. 760 (1898), considered as the leading case and *the* authority on medical negligence [Kramer, Medical Malpractice, 6 (1972)], held that ". . . a departure from approved methods in general use, if it injures the patient, will render him (the physician) liable however good his intentions may have been." A specialist, such as Dr. Ketchum, is held to a degree of skill and knowledge ordinarily possessed by other specialists in the same field and not the skill and knowledge of a general practitioner. *See* 70 C.J.S. *Physicians and Surgeons*, § 41.

from the testimony of the prosecution witnesses to allow the jury to conclude that Dr. Ketchum's performance of the operation and the aftercare he provided were "a gross deviation from the standard of care that a reasonable person would observe in the situation." The fact that the County Medical Society later codified standards for performing abortions does not affect the conclusion that the statute was constitutionally applied to the petitioner.

Even the two major defense witnesses testified that it was general practice for the patient's appearance, vital signs, breathing, blood pressure and pulse to be checked at regular intervals (every five to ten or fifteen to thirty minutes). (R., Vol. III at 1666–67, 1872). These same witnesses testified that the general practice would be to make arrangements to replace blood or blood volume upon seeing a great loss of blood. (R., Vol. III at 1674–75, 1878–79). The testimony at trial revealed that none of these were done to Mrs. Smith. Indeed, blood pressure and pulse were never taken after the operation. (R., Vol. I at 467–68). It is just such failure to perceive that the statute is designed to proscribe. NYPL § 15.05(4).

If the court were to accept the petitioner's argument that the absence of a statutory standard of care should preclude his prosecution, and take it to its logical extension, it would mean that Dr. Ketchum had no obligation whatsoever to his patient to perform in any particular way, and that he could have used any methods at all to remove the fetus from the patient and not be subject to criminal prosecution for his acts.

The court cannot accept the argument that there was no proof of a standard of care. The jury had sufficient evidence before it to find that there was an uncodified standard of care and that the petitioner's actions were a gross deviation from that standard. The petitioner was on notice, or is properly charged with notice, of the standard of care that he should have followed with respect to his patient. The absence of standards within the statute itself is not controlling to a question of proper notice in such a situation as this.

■ The last portion of the petitioner's notice argument is that the statute, indictment, bill of particulars and case law nowhere advised him of the elements of the offense, that he was not aware of these "elements" until the prosecutor's opening statement and the prosecutor continually shifted the theory of his case resulting in new "elements" of the crime constantly being introduced into the trial. At the Court of Appeals, the petitioner argued that if the statute were not unconstitutional on its face, then as applied to the defendant it was "vague and uninformative." [9] (Appellant's Brief, N.Y. Court of Appeals, at 4). The lack of notice argument made in state court cannot be read to include the "elements of the offense" argument.[10] Most, if not all, of the petitioner's argument in this area in the state court concerned the absence of a standard of conduct generally and of any proof as to a standard of care or a "gross deviation" from such a standard at trial. The petitioner did not raise the argument that he was not informed of the elements of the crime in state appellate court.[11] Therefore, for failure to raise that

9. Much of the argument here centers around the allegedly ambiguous charge in the indictment that the petitioner caused the death by choice of a particular surgical procedure, "under all the circumstances." This last phrase some courts have found to be an essential element in negligent homicide prosecutions. *United States v. Escamilla*, 467 F.2d 341, 347 (4th Cir. 1972) (en banc) ["Gross negligence . . . is to be determined by all of the facts and circumstances surrounding an act . . . ."].

10. Some vague statutes have been invalidated for failing to provide adequate standards by

which to test the legality of an indictment. *See United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 92, 41 S.Ct. 298, 66 L.Ed. 516 (1921). While the petitioner cited this case in his state appellate brief, he did not indicate there that he was challenging the definiteness of the statute for that purpose. (Brief, N.Y. Court of Appeals, at 16).

11. The trial attorney made two motions to dismiss challenging the propriety of the indictment. (R., Vol. IV at 2498, 2780–95). However, these specific challenges were not continued through appellate courts.

argument, or its "substantial equivalent," this court rules that the petitioner has not exhausted his state remedies on this issue. *Picard v. Connor, supra*; 28 U.S.C. ¶ 2254(b).

In a similar manner, the petitioner has failed to make the following arguments concerning necessary elements in state court. First, he contends that there was no proof at trial that a "vaginal hysterotomy," the method charged in the indictment, was performed. Second, the petitioner argues that there was no evidence that his technique of abortion was as hazardous or more so than continued pregnancy, or that the surgical procedure was a substantial and unjustified risk of death as required by the statute. Thus, these arguments that the conviction lacked evidence of crucial elements cannot be considered here. The petitioner has not presented them to the state appellate courts.

■ The petitioner's second major argument is that the prosecutorial misconduct at trial and in summation was so grievous and systematic as to violate the fourteenth amendment guarantee of a fair trial. Even though many instances of alleged prosecutorial misconduct were not objected to, under all of the circumstances these issues may be raised now. *See Lefkowitz v. Newsome*, 420 U.S. 283, 95 S.Ct. 886, 43 L.Ed.2d 196 (1975); *United States ex rel. Schaedel v. Follette*, 447 F.2d 1297, 1300 (2d Cir. 1971).

The task of this court will be first to proceed to the substantive question of whether the prosecutorial conduct complained of in the state appellate courts resulted in a deprivation of the petitioner's constitutional rights. If such a deprivation is found, not only has the petitioner exhausted state remedies (without having made contemporaneous objections), but he will also be entitled to the writ of habeas corpus. *United States ex rel. Schaedel v. Follette, supra.*

It should be noted that the court review must of necessity be a limited one of determining whether there has been a due process violation, and not whether the prosecutor's conduct would be acceptable to this court. The Supreme Court delineated the purpose of federal review of state convictions in these terms:

> Before a federal court may overturn a conviction resulting from a state trial . . ., it must be established not merely that the instruction [or conduct of the prosecutor] is undesirable, erroneous, or even "universally condemned," but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment. *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

Dr. Ketchum argues that the cross-examination of the principal medical expert witness "seriously abridged" his right to call witnesses, and cites cases in which defendants have been completely unable to confront witnesses or present witnesses on their behalf. *In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948); *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). That witness, Dr. Milan Vuitch, of Washington, D.C., had been the object of a number of prosecutions for abortion. One, a misdemeanor conviction in Maryland, was reversed by a federal district court on a writ of habeas corpus. *Vuitch v. Hardy*, 473 F.2d 1370 (4th Cir. 1973), cert. denied, 414 U.S. 824, 94 S.Ct. 126, 38 L.Ed.2d 57 (1973). In another, the federal district court dismissed an indictment for abortion in the District of Columbia [*United States v. Vuitch*, 305 F.Supp. 1032 (D.D.C. 1969)], but the Supreme Court reinstated the indictment and remanded for further proceedings. *United States v. Vuitch*, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971).

The prosecutor at Dr. Ketchum's trial began with this question to Dr. Vuitch:

Q. As has Dr. Ketchum, you have had troubles with the law because of

abortions, haven't you? (R., Vol. III, at 1514).[12]

The defense attorney immediately objected and the court instructed the jury to disregard the question. The following exchange took place shortly thereafter:

BY MR. CLEARY:

Q. Have you been convicted, Doctor, for illegal abortions?

A. I was indicted 16 times.

Q. For performing illegal abortions, right?

A. I was instrumental in legalization of the abortion surgery in the United States, as you know very well, Mr. Attorney.

Q. I understand that, Doctor. You have been convicted, have you not, for illegal abortions?

A. That conviction was erased by the Federal Court.

Q. You are still not answering my question, Doctor.

MR. CARLISI: I object.

MR. CLEARY: I would appreciate it if you would.

MR. CARLISI: I am going to continually object to this whole line of questioning.

THE WITNESS: Yes, I was convicted in the lower courts.

MR. CARLISI: This is irrelevant, immaterial and highly prejudicial to the defense. If you continue allowing this type of questioning I ask the court to allow the doctor to explain the fact that the Supreme Court of the United States vindicated him and overruled and overturned every one of those decisions.

THE COURT: Wait a minute, counsel. You are saying two things. We are talking about two things. We are talking about convictions first of all and convictions are proper to impeach the credibility of the witness.

MR. CARLISI: I'm not so sure, your Honor. If I may be heard for a moment, I'm not sure the doctor understands that an overturned reversed case on the part of a higher court indicates—

THE COURT: Are you saying that his convictions were reversed?

MR. CARLISI: Yes, sir.

THE COURT: By a higher court?

MR. CARLISI: Yes, sir.

THE COURT: His convictions were erased?

MR. CARLISI: He has no convictions.

THE COURT: Why doesn't he say that?

THE WITNESS: I am not legally trained, your Honor.

MR. CARLISI: He is a physician.

THE COURT: He knows whether or not there was a reversal of a conviction. Were you ever convicted and was that conviction reversed? Is that what you are telling us.

THE WITNESS: Yes.

THE COURT: Then you have never been convicted.

THE WITNESS: That's correct.

(R., Vol. III at 1514–16).

The petitioner argues that this court should assume "calculated impropriety" by the prosecutor because the decisions vindicating Dr. Vuitch were "fully reported long before questioning." However, counsel's citation for indictment dismissed in *United States v. Vuitch* [*i. e.*, Crim.No. 1460–70 (D.D.C. Nov. 4, 1971)], *supra*, belies that assertion. In that case, the Supreme Court ruled the district court had improperly dismissed the indictment initially and remanded the case for further proceedings. The fact that the indictment was dismissed a second time was not reported.

 The petitioner's conclusion that indictment or conviction of a crime by the

---

12. The petitioner argues that the question has a direct reference to Dr. Ketchum's prior "troubles" because of abortion. That inference is not clear to this court. Dr. Ketchum was having "troubles" because of abortion at that time, *i. e.*, he was being prosecuted for death of an abortion patient.

**946**

witness is "utterly irrelevant and highly prejudicial" lacks support. It has long been a proper function to impeach adverse witnesses by use of prior convictions. A prosecutor's questioning of a witness concerning an indictment which resulted in acquittal or reversal after conviction can be considered harmless error if a prosecutor has acted in good faith. *People v. Schwartzman*, 24 N.Y.2d 241, 299 N.Y.S.2d 817, 247 N.E.2d 642, *cert. denied*, 396 U.S. 846, 90 S.Ct. 103, 24 L.Ed.2d 96 (1969). Here there is no evidence of bad faith on the part of the prosecutor, there were instructions to disregard one of the questions, and the whole sequence of questions does not approach those situations in which convictions have been reversed because of a defendant's complete inability to cross-examine or present a witness. *See Chambers v. Miss., supra; In re Oliver, supra.* In addition, even if bad faith on the part of the district attorney were shown, this court does not find constitutional error in the state evidentiary ruling.

■ The petitioner contends that the extreme terms used by the prosecutor in reference to Dr. Vuitch and Dr. Ketchum at trial and summation further contributed to a pattern of misconduct that denied him a fair trial. The prosecutor, for example, referred to Dr. Vuitch as an "arrogant self-proclaimed king of abortionists" and "the Viennese sausage maker . . . ." (R., Vol. IV at 2333–34). Such phrases as "the out of state carpetbagging physician" and ". . . some carpetbagging charlatan" were used to refer to Dr. Ketchum. (R., Vol. IV at 2294, 2301). The prosecutor emphasized the fact that Dr. Ketchum was making significant sums of money for the abortions he performed by using such phrases as ". . . he has got to clear that table to put somebody else on it and to get another five hundred bucks." (R., Vol. IV at 2293). There was testimony by the petitioner's receptionist that he charged $500 for the operation in question, that he required payment in advance and the money was at times placed on the operating table. (R., Vol. I at 469). The prosecutor represented Dr. Vuitch as saying: "I take

the law into my own hands. I do what I damn well please." (R., Vol. IV at 2334). While this is harsh language, the witness admitted that he had performed abortions when it was illegal to do so. (R., Vol. III at 1518–20).

Such conduct can be categorized as improper, but more than that is needed to establish a due process violation. The First Circuit has noted that a statement of opinion from a prosecutor may be unethical, but that ". . . the jury knows that the prosecutor is an advocate and it may be expected, to some degree, to discount such remarks as seller's talk." *DeChristoforo v. Donnelly*, 473 F.2d 1236, 1238 (1st Cir.), *rev'd on other grounds*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Much of the prosecutor's improper references can be classified as just such "puffing." Most of these statements had bases in the testimony of various witnesses and cannot be considered misstatement of facts.

■ The petitioner argues that the prosecutor made reference to the fact that Dr. Ketchum did not testify. The comment complained of is highlighted in the following passage:

> . . . even if having gone that far along the line of negligence, he had simply taken the time from the rest of his patients to check that woman out, he would have seen the signs that everybody else saw, that the unprofessional saw, Ellenberg, Nicosia, he would have been able to save her and Ketchum was obliged to take that time. For the very choice of his procedure, the danger signals, the red light should have been flashing on, the siren should have been going off in his head, I had better watch her. Not him, *he sits there and placidly stares ahead.* That is what he did then, just completely forgot about her, too busy. That is criminally negligent homicide.

(R., Vol. IV at 2329–2330) (emphasis added).

While the highlighted reference itself seems quite ambiguous—whether it is a comment on his actions the day of the death

or to his actions at trial—the sentence immediately following it indicates the reference was most likely to his actions the day he performed the abortion. The comment is in no way similar to the situation in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), where state law permitted instructions and the court did instruct the jury that a defendant's failure to testify could be considered as "tending to indicate the truth" of the evidence against the defendant. *Id.* at 610, 85 S.Ct. 1229. In addition, when considering such claims of prosecutorial misconduct, the Supreme Court has specifically commented:

> . . . [our observations] do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

*Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974).

This court does not interpret the comment as a reference to the fact that Dr. Ketchum did not testify.[13]

The petitioner argues that the prosecutor made improper reference to the fact that Mrs. Ketchum, who was assisting at the office when the abortion and death took place, did not testify and that the court gave improper instruction to the jury concerning her failure to testify. These two matters were never raised in state appellate courts and cannot be reviewed here because of failure to exhaust state remedies. 28 U.S.C. § 2254(b).

The petitioner's argument that the prosecutor's conduct was so improper as to reflect a pattern of conduct which resulted in denial of a fair trial to petitioner cannot be accepted. While the prosecutor's statements and actions may be considered improper, undesirable, or even "universally condemned," they do not rise to the level of

constitutional violations. *Cupp v. Naughten, supra.* The type of ordinary trial errors that are indicated in this case can only be remedied by the state appellate courts in the exercise of their supervisory authority. A federal writ of habeas corpus is not the appropriate vehicle.

For these reasons, the relief requested and the writ of habeas corpus are denied in all respects.

Certificate of probable cause is granted.

So ordered.

---

**13.** The petitioner claims that a portion of the opening statement ["We will introduce you to Dr. Ketchum as well as we can." (R., Vol. I at 65)] was a reference to the petitioner's failure to testify. This claim is not considered here since it was not raised on the state appeal.