the order of December 15, 1983 is inconsistent with this order, it is VACATED.[28]

UNITED STATES of America ex rel.
Phil SHAW, Petitioner,

v.

Richard DeROBERTIS, Warden, Stateville Correctional Center, and Tyrone Fahner, Attorney General of the State of Illinois, Respondents.

No. 82 C0889.

United States District Court,
N.D. Illinois, E.D.

Feb. 13, 1984.

Phil Shaw, pro se.

Marcia Friedl, Asst. Atty. Gen., Chicago, Ill., for respondents.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Petitioner, Phil Shaw, is serving a sentence of 40 years at Stateville Correctional Center after a jury convicted him of murder. His conviction was affirmed by the Illinois Appellate Court in *People v. Shaw*, 98 Ill.App.3d 682, 54 Ill.Dec. 84, 424 N.E.2d 834 (1st Dist.1981), and the Illinois Supreme Court denied his petition for leave to appeal on November 30, 1981. In this court Shaw seeks issuance of a writ of habeas corpus on the same grounds that he unsuccessfully raised in the Illinois Appellate Court: (1) that a prior consistent statement of a state's witness should not have been introduced as an exception to the prohibition against hearsay evidence; (2) that the court erred in instructing that only the defense attorney who was conducting cross-examination could make appropriate objections; and (3) that prosecutorial misconduct during closing argument deprived him of due process. Respondents have moved for summary judgment and petitioner has cross-moved for summary judgment. After a thorough examination of the state court proceedings the court concludes that petitioner's claim of prosecutorial misconduct warrants habeas corpus relief.

### I. REVIEW OF THE RECORD

The Illinois Appellate Court determined that petitioner's claims of prosecutorial misconduct did not warrant disturbing the jury verdict or the trial court's judgment below. The state court arrived at this conclusion "in light of [the] fact" that a "guilty verdict was the only reasonable conclusion to be reached based on the evidence," and the fact that "the trial judge promptly sustained objections to most of the improper remarks". This finding will be critical to the disposition of petitioner's prosecutorial misconduct claims if it is entitled to a presumption of correctness under *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). *Sumner* held that the habeas corpus statute requires federal courts to presume that the factual findings of a state trial or appellate court

are correct unless certain statutory exceptions apply. *See* 28 U.S.C. § 2254(d) (1976).[1] The questions to be decided, therefore, are (1) whether the state court finding in this case is a "factual finding" entitled to the § 2254(d) presumption, and (2) whether any of the statutory exceptions apply.

██ "Issues of fact" as used in 28 U.S.C. § 2254(d) are "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators". *Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963) (*quoting Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (opinion of Frankfurter, J.)). *See United States ex rel. Rivers v. Franzen,* 692 F.2d 491, 497 (7th Cir.1982). Conclusions of law, however, or mixed determinations of law and fact, are not entitled to the presumption of correctness under § 2254(d). *Sumner v. Mata* ("*Sumner II*"), 455 U.S. 591, 597 and n. 9, 102 S.Ct. 1303, 1306 and n. 9, 71 L.Ed.2d 480 (1982) (per curiam) (*citing Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Neil v. Biggers,* 409 U.S. 188, 193 n. 3, 93 S.Ct. 375, 379 n. 3, 34 L.Ed.2d 401 (1972)). *See also United States ex rel. Rivers v. Franzen, supra; United States ex rel. Cosey v. Wolff,* 682 F.2d 691, 693 (7th Cir.1982).

The line between issues of fact and conclusions of law, or mixed determinations of law and fact, is often difficult to draw with precision. *Cf. United States ex rel. Rivers v. Franzen, supra.* Prior case law, however, provides some guidance as to how the state court findings in this case should be classified. In *Moore v. Duckworth,* 687

F.2d 1063 (7th Cir.1982), where the jury was prevented, under Indiana's rape shield law, from being told that the victim was pregnant by her boyfriend, the court accorded the presumption of correctness to the Indiana Supreme Court's finding that the record did not indicate that the jury knew the victim was pregnant. Similarly, the finding of the Indiana trial and supreme court that petitioner never requested an attorney although advised of that right was held to be a determination of fact under *Sumner* and § 2254(d) in *Holleman v. Duckworth,* 700 F.2d 391 (7th Cir.1983).

The Seventh Circuit has also characterized various state court determinations as involving mixed questions of law and fact and therefore not entitled to the presumption of correctness under § 2254(d). *See, e.g., United States ex rel. Rivers v. Franzen, supra* (question of bona fide doubt as to defendant's competency to stand trial); *United States ex rel. Scarpelli v. George,* 687 F.2d 1012 (7th Cir.1982), *cert. denied,* — U.S. ——, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983) (question of whether trial court violated defendant's right to cross-examine witness regarding prior inconsistent statements); *United States ex rel. Cosey v. Wolff, supra,* (question of lack of effective assistance of counsel).

The Supreme Court has stated that while the circumstances of pretrial identification procedures present questions of fact to which the § 2254(d) presumption applies, the ultimate question as to the constitutionality of pretrial identification procedures is a mixed question of law and fact that is not governed by § 2254. *Sumner II,* 455 U.S. at 597, 102 S.Ct. at 1306. Similarly, a distinction was drawn between a factual

---

1. Section 2254(d) provides that "a determination after a hearing on the merits of a factual issue, made by a state court of competent jurisdiction ... [and] evidenced by a ... written opinion ... shall be presumed to be correct "unless the petitioner for a federal writ of habeas corpus can establish one of the eight enumerated causes for exception to the presumption. Under the exception contained in section 2254(d)(8), state court factual findings are entitled to a presumption of correctness

... unless that part of the record of the state court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record ....

determination and the application of law to fact in *United States ex rel. Gorham v. Franzen,* 675 F.2d 932 (7th Cir.1982). In *Gorham* petitioner alleged that a confession had been obtained after he had refused to make a statement, and had therefore been introduced at trial in violation of his Fifth Amendment rights. *Gorham* held that the determination by the state appellate court that petitioner had equivocated as to whether he wished to make a statement was entitled to a presumption of correctness by the district court unless the finding was not fairly supported by the record. 675 F.2d at 936. The question of whether petitioner had exercised his right to remain silent was a separate determination, however, which was a conclusion of law or at least a mixed determination of law and fact. *Id.*

In this case, the appellate court's finding regarding the sufficiency of the evidence does not present a "basic, primary or historical fact" in the sense of a "recital of external events and the credibility of their narrators," but is more in the nature of the ultimate question of constitutionality presented in *Sumner II.* The appellate court's ruling that a guilty verdict was the only reasonable conclusion involves an evaluation of the evidence that this court is required to make under the harmless error doctrine whenever a habeas petitioner claims that prosecutorial comment deprived him of a fair trial.[2] A finding of no harmless error is an integral part of the ultimate

determination of unconstitutionality; it is, in effect, the legal standard by which such claims are judged and is thus not subject to the *Sumner* presumption. This court must therefore review the evidentiary record to decide the constitutional question raised.

Critical to a resolution of this petition is that the factual issue presented to the jury was whether or not petitioner was the person who shot Edward Lewis. The state did not seek to convict petitioner as an aider or abettor or as a conspirator or in any capacity other than as the man who pulled the trigger. The weight of the evidence, then, has to be measured against the burden the state assumed.

It is undisputed that on March 14, 1978, just before closing his liquor store at approximately 2:00 a.m., Edward Lewis let two men into the store, one of whom pulled a gun and shot and killed Lewis. The grand jury subsequently returned an indictment charging petitioner and Ricardo White with Lewis' murder (C. 8).[3] Petitioner was represented by the public defender, and a privately-retained lawyer, William Wood, appeared on behalf of co-defendant White (C.IA, C.6 C.31). The public defender's motion for a severance was granted (C.IA, C.26), and the cases were tried simultaneously, White having waived a jury trial (R.83, 86–87, 279–80).[4]

At trial the state sought convictions on the theory that Shaw actually fired the bullets that killed Lewis[5] while White was

---

2. As discussed *infra,* a conclusion that the evidence is sufficient to support a guilty verdict does not necessarily satisfy the harmless error standard. Moreover, the appellate court considered only petitioner's claims regarding prosecutorial comment on the integrity of defense counsel. It failed to consider those prosecutorial comments that are more directly connected to the question of sufficiency of the evidence on two critical issues in the case, both relating to identification. *See* discussion, *infra.*

3. "C" refers to the common law record of petitioner's state court proceedings.

4. "R" refers to the transcript of the circuit court proceedings in the case of *People v. Shaw,* No. 78–1485.

5. Specifically, the jury was given the following instructions regarding the charges against petitioner.

IPI Criminal Instruction No. 2.01: The defendant is charged with the crime of murder. The defendant has pleaded not guilty.

IPI Criminal Instruction No. 7.01: A person commits the crime of murder who kills an individual if, in performing the acts which cause the death,

he intends to kill or do great bodily harm to that individual; or

he knows that such acts will cause death to that individual; or

he knows that such acts create a strong probability of death or great bodily harm to that individual.

guilty of murder as an accomplice. Thus, the dispute at trial centered around two questions: (1) the identities of the two men in the liquor store, and (2) the identity of the man who pulled the trigger. With respect to the charges against Shaw, the state put on the stand three eyewitnesses to the crime: Lillian Farmer and Marva Davis, the cashiers in the liquor store, and Grandville Farmer, Lillian's husband, who was waiting outside the store in a car when the incident occurred.

The state's eyewitness testimony placed petitioner in the liquor store but was not wholly free of uncertainties. At trial both Lillian Farmer and Marva Davis identified petitioner as one of the two men who entered the liquor store the morning of the shooting (R. 296, 370). Mrs. Farmer had seen both petitioner and White before, and had seen both defendants in the liquor store earlier that evening (R. 295, 304–5). Marva Davis testified that she had known petitioner and White for about three years prior to the shooting incident, and stated that both of them came in the store often (R. 368, 373). Additionally, Mr. Farmer had identified petitioner in a police lineup on the day of the shooting (R. 410).

Despite the fact that all three eyewitnesses made positive identifications of petitioner as one of the two assailants, certain aspects of the eyewitness testimony also supported the possibility of misidentification. During cross-examination defense counsel showed Mrs. Farmer photographs of Ricardo White and Robert Craig. She admitted that, on the day of the shooting, police had presented those photographs to her and she had identified them as Lewis' assailants (R. 331–36). On redirect, the state showed Mrs. Farmer some additional photographs and asked if she had picked any of them as depicting Lewis' assailants

at the hearing on a motion to suppress identification. Mrs. Farmer indicated that she had selected a photograph of petitioner at the suppression hearing (R. 345). Additionally, when Mr. Farmer was shown photographs at the police station three or four days after the shooting, he identified photographs of petitioner and Ricardo White, and also picked out a photograph of John Shaw, Phil Shaw's brother, as resembling one of the two men he saw in the store (R. 445–48). Neither John Shaw nor Robert Craig were in the lineup which Mr. and Mrs. Farmer viewed on the day of the shooting (R. 527–29).

Marva Davis' recollection was vague regarding her statements to the police on the night of the murder. She first testified that after the shooting she probably did not mention the names of the offenders to the police, but then stated that she did not know what she told the police. Davis went on to say that she was not sure if she told the police that White was present but she did tell them that petitioner was there (R. 392). In further testimony Davis stated she was not sure if she told police that she knew the two men who came to the store, and did not know if she gave their names (R. 393). Davis did state that she gave the police petitioner's phone number the night of the shooting (R. 397). Officer Rosas, a beat officer, testified that he arrived at the liquor store and spoke with the witnesses shortly after the shooting. According to Rosa none of the witnesses gave him the name of any alleged offenders (R. 510).

The morning of the shooting police located the assailants' car, identified by Grandville Farmer as being the one he saw leaving the scene of the shooting, in the driveway of petitioner's residence[6] (R. 469). The auto belonged to Larry Craig (R. 480).

IPI Criminal Instruction No. 7.02: To sustain the charge of murder, the State must prove the following proposition:
FIRST: That defendant performed the acts which caused the death of Edward Lewis, Sr.
SECOND: That when the defendant did so, he intended to kill or do great bodily harm to Edward Lewis, Sr., or he knew that his acts

created a strong probability of death or great bodily harm to Edward Lewis, Sr.

6. At trial Mr. Farmer testified that he had noticed the car parked outside the liquor store prior to the shooting, with four people in it. The car proceeded down the street for a distance after two men got out of the car and went into the liquor store.

The police found Ricardo White and Robert Craig, but not petitioner, at the residence (R. 472–73).

Valerie Johnson, a friend of the Shaw family, testified for the defense. She stated that she received a phone call from Marva Davis several days after the shooting (R. 515–16). According to Johnson they discussed the incident and Davis stated that Rick White and "another guy" had been involved. Johnson said that Davis never mentioned petitioner's name (R. 517). Marva Davis, on cross-examination, testified that Johnson had initiated the telephone call to find out "what was going on" (R. 389, 390). She denied that she had told Johnson that a man named Track shot Lewis or that she had called Johnson because she felt guilty and wanted to know what had happened to petitioner (R. 390).

The evidence concerning who actually shot Lewis was significantly more contradictory. Although Lillian Farmer said that she saw a gun in petitioner's hand following the shooting, her testimony was inconsistent in her description of the man who had the gun. Mrs. Farmer testified that the first individual to enter the store was White, who immediately went over to Marva Davis, 30 feet to the left of Mrs. Farmer (R. 297, 321–22). White then came over to Mrs. Farmer and bought a half-pint of gin (R. 298). Petitioner was, meanwhile, standing by the cigarette machine near Mrs. Farmer's counter, facing sideways (R. 298, 315–16).

Mrs. Farmer then testified that while petitioner was still standing near the machine, about 10 feet from Lewis, White and Lewis began "messing around," tussling, pulling, reaching or hitting at each other, and White appeared to be trying to catch Lewis by the arm or go in his pocket (R. 300–301). Mrs. Farmer thought they were just playing, and turned to get a Coke which a third customer had ordered. When she turned around she heard four shots and saw a gun in petitioner's hand pointed at Lewis (R. 302). Mrs. Farmer got down on the floor after she turned around and saw the shots coming (R. 338). She de-scribed White as "going around, or whatever he was doing" during the shooting (R. 303). Petitioner and White then turned and walked out of the store (R. 303).

On cross-examination Mrs. Farmer stated that White was wearing a navy blue jacket and navy skull cap, and that petitioner wore a light beige or gray jacket (R. 321–23). She also testified that she told police, right after the incident, that the person who bought the alcohol wore a short blue jacket and skull cap (R. 355). Mrs. Farmer later admitted that at the preliminary hearing she had testified that White was wearing a gray jacket at the time of the shooting (R. 324). According to the police investigator who spoke with Mrs. Farmer shortly after the shooting, she had stated at that time that the man in the gray coat, who had the gun, had purchased the alcohol from her (R. 524).

Marva Davis did not see the shooting. Davis testified that White was wearing a navy blue jacket and Shaw a gray one on the night of the murder (R. 373). White walked to her register in the back of the store, while Shaw "kind of laid back toward the front". She directed White to the front register because hers was closed (R. 370). As Davis was counting her money she heard a number of shots and, describing herself as in a state of shock, got down on the floor upon Mrs. Farmer's instruction and after Mrs. Farmer physically pulled her to the floor (R. 372, 389). Davis did not see either White or petitioner after she heard the shots (R. 373), nor did she see who had the gun (R. 388). Lillian Farmer testified that Davis screamed, "Why would Phil want to do a thing like that?" after the shooting (R. 307–8). Davis, however, gave no testimony that she made a statement concerning either Shaw or White at the time of the shooting.

Mr. Farmer was parked in his car, waiting for his wife to get off work, when the shooting took place (R. 403). Mr. Farmer stated that he told the police that one of the men had on a light gray or beige jacket and the other one had a dark or navy jacket (R. 456–57), and also testified that the man

wearing a beige or gray jacket was the one who shot Lewis (R. 406, 424, 460). Contrary to the testimony of Mrs. Farmer and Marva Davis, however, Mr. Farmer stated that petitioner, wearing a navy jacket, was the one who entered first and walked to the back of the store, and that White, wearing a gray jacket, remained in the front near the cigarette machine (R. 420–21). Mr. Farmer saw both men talking and "scuffling" with Lewis and stated that petitioner, wearing the navy jacket, had Lewis by the hand and seemed to be trying to go into Lewis' pockets (R. 406). Lewis jerked away and faced the man in the gray jacket, who came out with a gun and began shooting (R. 406). Mr. Farmer further testified:

A. I noticed that the one had the gun in his hand, he passed right by me and the only thing I noticed I saw them walk right passed [sic] me. I got out of the car at that time.

Q. Mr. Farmer ... I ask you to look around the courtroom and ask you if you see those persons ....

A. Yes, I do.

Q. Would you please point to the man you saw with the gun ....

A. There.

Q. What is he wearing today?

A. A beige shirt.

MR. KULL [Public Defender]: Let the record show the witness has identified Ricardo White.

(R. 407–408).

Over defense counsel's objection Mr. Farmer identified an exhibit as a photograph of a five-man lineup that he had attended on the day of the shooting. On the state's request that he point out the man in the lineup whom he had identified as carrying the gun, Mr. Farmer marked an "X" above petitioner's position in the lineup (R. 410).

## II. PETITIONER'S CLAIMS

[2, 3] At the outset, the court notes that the standard to be applied in determining whether petitioner's claims warrant habeas corpus relief is a narrow one. The habeas remedy was not intended to grant the fed-eral courts general supervisory authority over state criminal proceedings, or the authority to sit in appellate review of state court convictions. *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). *See also Passman v. Blackburn*, 652 F.2d 559, 567 (5th Cir.1981), *cert. denied*, 455 U.S. 1022, 102 S.Ct. 1722, 72 L.Ed.2d 141 (1982). The federally-issued writ is limited to those convictions obtained in violation of some provision of the United States Constitution. *Smith v. Phillips, supra.* This court must therefore make a determination whether any of petitioner's claims rise to the level of a constitutional violation before the writ may be granted.

### A. *Challenge to Evidentiary Ruling*

Petitioner's challenge to the trial court's evidentiary ruling must be dismissed. Petitioner argues that a prior consistent statement of a state's witness should not have been introduced as an exception to the prohibition against hearsay evidence. Petitioner contends that he was denied a fair trial when the trial court permitted Lillian Farmer to testify, on redirect examination by the State, that she had identified a photograph of petitioner at the November 9, 1978 hearing on the motion to suppress identification. On direct examination the State had not asked Farmer whether she had previously identified petitioner, while on cross-examination Farmer admitted to identifying Ricardo White and Robert Craig on the day of the shooting. The trial court ruled, over defense counsel's "beyond the scope of cross examination" and "hearsay" objections, that by questioning Farmer on cross-examination about her photographic identification of Shaw, defense counsel had opened the door to further questioning on redirect regarding such identification (R. 341–43).

Before the appellate court petitioner argued another ground for excluding Mrs. Farmer's identification testimony: that prior consistent statements may be used to rehabilitate a witness only if they are part

of the statements that were used to impeach the witness. The appellate court, ignoring this new basis for objection, held that Farmer's testimony regarding her prior identification was admissible because defense counsel had opened the subject area on cross-examination. In his habeas petition Shaw argues the same grounds for excluding Mrs. Farmer's identification testimony that he argued in his state appeal.

■ State evidentiary rulings should rarely be the cause of habeas review since the admission of evidence and the extent and scope of cross-examination are matters within the broad discretion of the trial judge. *Cramer v. Fahner*, 683 F.2d 1376, 1385 (7th Cir.1982), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 509 (1982); *United States v. Isaacs*, 493 F.2d 1124 (7th Cir.1974), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). Because the admissibility of evidence in state courts is a matter of state law, evidentiary questions are not subject to federal review under § 2254 unless there is a resultant denial of a specific constitutional right or the error is of such magnitude as to result in a denial of fundamental fairness. *United States ex rel. Clark v. Fike*, 538 F.2d 750, 757 (7th Cir.1976), *cert. denied*, 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781 (1977). The standard for judging whether an evidentiary error constitutes a denial of fundamental fairness is "whether it is 'material in the sense of a crucial, critical, highly significant factor [in the outcome of the case].'" *Cramer v. Fahner*, 683 F.2d at 1385 (adopting Fifth Circuit standard).

The court finds no error under state law in the appellate court's decision that the testimony was admissible as an exception to the hearsay rules or within the scope of cross-examination. With respect to the grounds raised by petitioner on appeal but not considered by the appellate court, petitioner faces a waiver problem. It is a rule beyond dispute that only those evidentiary objections specifically raised at trial are preserved for appeal; all unstated objections to the evidence in question are waived. Since the appellate court did not

and was not required to consider petitioner's alternative ground for exclusion of the evidence, that claim is waived for purposes of habeas review unless petitioner can establish cause and prejudice under the doctrine of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and its progeny. *See* fn. 7 *infra*.

■ But even assuming petitioner's claim is properly before this court and the trial court did, in fact, improperly admit the evidence, *see People v. DePoy*, 40 Ill.2d 433, 240 N.E.2d 616 (1968), this court sees no error of a constitutional magnitude. Mrs. Farmer identified Shaw on direct examination as one of Lewis' assailants. On cross-examination she admitted that shortly after the crime she identified a photograph of another man, not Shaw, as one of the assailants. On redirect she testified that she identified photographs of Shaw at a suppression hearing which took place a week before the trial. The discrepancy between Mrs. Farmer's "at the scene" and subsequent identifications was thus established, and Mrs. Farmer's redirect testimony was merely cumulative of her statements on direct.

### B. Challenge to Judge's Handling of Trial Proceedings

■ Petitioner also claims that the trial court erred in ordering one public defender to refrain from making objections to the answers of a state witness while his co-counsel was conducting cross-examination. As with the previously discussed evidentiary rulings, the maintenance of orderly proceedings is a matter committed to the wide discretion of the trial judge. The court sees no fundamental unfairness to petitioner in the state court's orders regarding the making of objections. This claim, therefore, does not support habeas relief.

### C. Challenges to Prosecutor's Statements

Petitioner's final claim is that statements made by the prosecutor in closing argument were so prejudicial and egregious as to amount to a denial of due

process. Specifically, petitioner indicates that the prosecutor improperly (1) referred to the defense lawyers as "hired guns," and stated that they were paid to mislead and confuse the jury; (2) made repeated reference to the fact that the jury was being misled; (3) called the defense attorneys frauds; (4) argued that the defense was misleading the jury with the police reports and stated that, although the reports were unavailable to the jury as hearsay evidence, if the jury had the reports they would see the "truth"; and (5) "instructed" the jury on the law of accountability [7] although the state was not relying on that theory as to petitioner.

 As with the evidentiary ruling previously discussed, the standard of review regarding petitioner's prosecutorial misconduct claims is a narrow one. The court must first determine whether the prosecutorial misconduct constituted constitutional error. *See e.g., United States ex rel. Smith v. Franzen,* 660 F.2d 237 (7th Cir.1981), *vacated and remanded on other grounds,* 457 U.S. 1102, 102 S.Ct. 2898, 73 L.Ed.2d 1310 (1982). Absent the violation of a specific guaranty contained in the Bill of Rights, claims of prosecutorial misconduct do not reach the level of constitutional error unless, in the context of the entire proceedings, the prosecutor's conduct can be said to render the trial so fundamentally unfair as to deny the petitioner due process of law under the Fourteenth Amendment. *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Cupp v. Naughten, supra. See*

*also Branch v. Estelle,* 631 F.2d 1229, 1233 (5th Cir.1980). Statements that might be considered "improper, undesirable or even universally condemned [do] not [necessarily] rise to the level of constitutional violations." *Ketchum v. Ward,* 422 F.Supp. 934, 937 (W.D.N.Y.1976), *aff'd* 556 F.2d 557 (2d Cir.1977). *See Cobb v. Wainwright,* 609 F.2d 754, 755–56 (5th Cir.1980), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980). The question to be answered is whether the remarks had any likelihood of changing the result of the trial. *United States v. Castenada,* 555 F.2d 605, 610 (7th Cir.), *cert. denied,* 434 U.S. 847, 98 S.Ct. 152, 54 L.Ed.2d 113 (1977).

If it is established that any of the prosecutor's statements rise to the level of constitutional error, the court must then consider the trial record as a whole and ignore errors that are harmless. *United States v. Hasting,* — U.S. —, —, 103 S.Ct. 1974, 1977, 76 L.Ed.2d 96 (1983). The court must apply a reasonable doubt standard in deciding the harmless error issue. The question to be answered is whether, absent the constitutional error, it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict. *Id. See Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–828, 17 L.Ed.2d 705 (1967).[8]

The court will initially consider the constitutionality of the prosecutor's statements which referred to the defense lawyers as "hired guns" and "frauds," and which stated that the defense had deliber-

---

**7.** A potential waiver problem is created by the fact that the petitioner's claim regarding the prosecutor's accountability instruction was not formally presented as an issue on appeal. Under the waiver doctrine a federal court may decline to exercise its habeas corpus jurisdiction where there is no presently available state remedy but the petitioner bypassed an earlier opportunity to have a state court consider his constitutional claim. *See Engle v. Isaac,* 456 U.S. 107, 128–29, 102 S.Ct. 1558, 1571–72, 71 L.Ed.2d 783 (1982); *United States ex rel. Spurlark v. Wolff,* 699 F.2d 354, 356 (7th Cir.1983). In light of the court's duty to examine the entire record in a prosecutorial misconduct case, however, the waiver analysis does not apply here. *See Cobb v. Wainwright,* 609 F.2d 754, 755 n. 1 (5th Cir.

1980). Moreover, the court notes that petitioner's claim regarding the accountability instructions, though not resolved on appeal, was clearly presented in petitioner's state court brief.

**8.** As noted in *Cramer v. Fahner,* 683 F.2d at 1385, the questions of fundamental unfairness and harmless error are closely related and sometimes answered simultaneously. The former involves an analysis of whether, in the context of the proceedings, the error is so prejudicial as to deprive petitioner of a fair trial, while the latter requires the court to determine whether the conduct, though improper, could have affected the outcome of the trial.

ately tried to mislead the jury.[9] As the appellate court noted, these remarks constituted an attack on the integrity of the defense which was clearly improper and cannot be condoned. The court notes that, at the beginning of the prosecutor's closing, the trial court overruled objections to the prosecutor's references to the defense attorneys as "hired guns" who were paid to mislead and confuse the jury. This fact could easily have suggested to the jury that the court agreed with these statements, thereby persuading the jury to give extra credence to the prosecutor's subsequent litany as to how the jury was being misled.[10] The prejudicial effect of the remarks is nevertheless mitigated by the fact that the jury knows the prosecutor is an advocate, and therefore may be expected, to some degree, to "discount the remarks as seller's talk." *Donnelly v. DeChristoforo, supra.*

Additionally, the court notes that the prosecutor's repeated emphasis on the fact that the defense was misleading the jury as to witness testimony was likely an effort, at least in part, to respond to defense counsel's closing argument. Generally, an advocate should be given considerable latitude in replying to his opponent's arguments. *U.S. v. Grabiec,* 563 F.2d 313 (7th Cir.1977). Here, provocation is a factor to be considered, *United States ex rel. Perry v. Mulligan,* 544 F.2d 674, 679 (3d Cir.1976), *cert. denied,* 430 U.S. 972, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977), and while it does not excuse prosecutorial error it is a factor which mitigates the

---

**9.** The prosecutor began his closing argument by stating:

> MR. GARZA: I hope you didn't think that these defense lawyers would simply lay down and play dead and let three witnesses come up here and identify petitioner and leave the case at that. Because, if that had been the case we would not have been here today. The defense lawyers are hired guns they....
> MR. GRIBBEN: Objection, Judge.
> THE COURT: Overruled.

(R. 589–90).
The prosecutor also referred to defense counsel as frauds because they asked a state witness whether she had ever had intimate relations with the victim:

> MR. GARZA: Well, that's it for their mistaken identification. They have done the job. But what bothers me most about what they did by Marva Davis, is that these two men, these defense lawyers, had the audacity to stand before you in opening statements and say they grieve at the loss of Edward Lewis, when they put Marva....
> MR. GRIBBEN: Objection.
> MR. KUHL: We're not on trial.
> THE COURT: Overruled.
> MR. GARZA: When they get up there and put Marva Davis on here in front of Edward Lewis' son, who is still in the courtroom, and ask her if she ever had intimate relations with Edward Lewis. What a fraud these two lawyers are.
> MR. KUHL: Objection.
> THE COURT: Sustained.

(R. 598).
The prosecutor concluded that the trial judge had seen through this tactic:

> MR. GARZA: It's an affront to me, it's an affront to the judge that something like that—

like that can be done in a courtroom. It is a good thing Judge Strayhorn saw through it.
> MR. KUHL: Objection, Judge.
> THE COURT: Sustained.
> GARZA: He could not see the relevancy of that as well.
> MR. GRIBBEN: Objection, Judge.
> THE COURT: Overruled.

(R. 599).

**10.** The prosecutor stated, "And let's go over the testimony, ladies and gentlemen. And I'm going to show you how you have been misled ...." (R. 591). Regarding the testimony of Lillian Farmer, the prosecutor stated, "Well, look at the testimony of Lillian Farmer, and I will show you how they have misled you," and, later, "She (Mrs. Farmer) was not mistaken. She certainly didn't lie. But, you are being misled." (R. 591, 594). In regards to Grandville Farmer's testimony, the prosecutor stated, "And this—all this cross examination about where he was looking (from outside the store) was an attempt to mislead you, because when is the one time that he really has the chance to see the shooter? When he walks into the store and petitioner is walking out past him, and sees the man he's described as petitioner with the gun in his hand" (R. 595).
Similarly, the prosecutor argued:

> Look at those pictures. The defendants would lead you to believe that no one could see into the glass .... You are simply being misled. The important part is, Grandville Farmer getting out of his car to see his wife, and seeing the two men.

(R. 596). The prosecutor then warned the jury against being misled by the fact that Grandville Farmer "misidentified" the "shooter," since he had made other identifications of petitioner as the "shooter" (R. 596).

severity of the harm. *Angel v. Overberg,* 682 F.2d 605, 608 (6th Cir.1982).

 The court therefore agrees with the state appellate court determination that the prosecutor's derogatory remarks regarding the defense attorneys, while improper, did not, alone, render the trial fundamentally unfair. *See United States ex rel. Kirk v. Petrelli,* 331 F.Supp. 792, 796 (N.D.Ill.1971) (reference to integrity of defense attorneys unfortunate and improper, but did not rise to the level of a constitutional violation). *See also United States v. Grabiec,* 563 F.2d at 319 (prosecutor's statement that he was "hoodwinked" by defense counsel did not reach level of reversible error); *Angel v. Overberg,* 682 F.2d at 607 (implication by prosecutor that defense witness lied at behest of defense counsel, casting doubt on defense counsel's integrity, did not warrant habeas corpus relief). *But see People v. Clark,* 114 Ill. App.3d 252, 70 Ill.Dec. 48, 448 N.E.2d 926 (1st Dist.1983) (repeated accusations of defense counsel trickery and deception deprived defendant of fair trial).

 Taken in isolation, the prosecutor's statements on the law of accountability [11] could be viewed as improper. While the scope and extent of oral argument are within the sound discretion of the trial court, the arguments of counsel must be confined to the issues of the case, *the applicable law,* pertinent evidence, and such legitimate inferences as may properly be drawn. *United States v. Quinn,* 467 F.2d 624 (8th Cir.1972) *cert. denied,* 410 U.S. 935, 93 S.Ct. 1390, 35 L.Ed.2d 599 (1973) (emphasis added). The court should exclude those statements that introduce irrelevant, prejudicial matters, or that other-

wise tend to confuse the jury, since the function of closing argument is to help the jury remember and interpret the evidence. *United States v. Sawyer,* 443 F.2d 712 (D.C.Cir.1971). In this case, the prosecutor's reference to the law of accountability could well have led the jury to conclude that it could find petitioner guilty even if it did not believe that he actually pulled the trigger, and even though a statement on the law of accountability was not part of the formal jury instructions.

The trial record clearly indicates that Shaw's jury was indeed confused by the prosecutor's "instructions". Although the trial judge instructed the jury that it could find Shaw guilty only if it concluded that he "performed the acts which caused the death of Edward Lewis, Sr." (R. 620), the jury sent the following written question to the judge once it began deliberations: "If a man is an accomplice to murder, will the law indict him on a charge of murder or accomplice to murder?" (R. 640). Not only does the note suggest jury confusion over the correct legal standard to be applied in petitioner's case, but it also appears to indicate the uncertainty in the jury's mind as to whether petitioner had shot Lewis or was merely an accomplice. *Cf. United States ex rel. DiGiacomo v. Franzen,* 680 F.2d 515, 518 (7th Cir.1982) (written question submitted to trial court shortly after jury began deliberations showed that jury was in fact confused by expert testimony).

The prosecutor's accountability comments must, however, be considered in the context in which they were made. The prosecutor's statements were in response to defense counsel's comment that petition-

---

**11.** The prosecutor gave the following instruction on the law of accountability:

> MR. GARZA: And Phil Shaw is somehow missing that two or three or four, A.M. ... from his home, and the others aren't. And you must ask yourself, why that is. He's nowhere to be found, ladies and gentlemen. For good reason. Ricky White is to be found, because he's probably not sharp enough to realize that there is a law in this state about accountability. You can be held accountable for the actions of—

> MR. GRIBBEN: Objection.
> MR. KUHL: Objection.
> THE COURT: Overruled.
> MR. GARZA: If you are with a gunman and do anything to aid that gunman, *that you can be convicted of murder.* Ricardo White doesn't realize that he should flee. Certainly doesn't realize that, but Phil Shaw realizes that because the gun was in his hand, and that's why he is not at home.
> (R. 603, emphasis added).

er was not at the scene when White was arrested. As noted above, the State is generally accorded freer rein in responding to opposing counsel's arguments. Moreover, the accountability statements were an attempt to explain why White did not flee rather than a direction that Shaw could be found guilty even if he did not pull the trigger. The record, nonetheless, indicates that these statements confused the jury, and they must therefore be considered in deciding whether any violations of Shaw's constitutional rights were harmless beyond a reasonable doubt.

 That clear constitutional violation arises from the prosecutor's reference to police reports. There is no question that the prosecutor's reference to police reports not in evidence [12] was improper. Counsel are never justified in arguing facts outside of the record. *Branch v. Estelle,* 631 F.2d at 1234. *Cf. United States v. Davis,* 532 F.2d 22, 28 (7th Cir.1976) and *United States v. Fearns,* 501 F.2d 486, 489 (7th Cir.1974) (applying same rule to appeals from federal criminal convictions). By arguing that if the jury could see the police reports, they would see the "truth," the prosecutor insinuated a knowledge of prejudicial facts unavailable to the jury and bolstered the inference that the jury was being misled. *Cf. Branch v. Estelle, supra.*[13] That argument, further, had to be known to the prosecutor to be grossly improper and wholly avoidable.

Improper references to facts outside the record also implicate specific constitutional rights. Implicit in the guarantees of the Sixth Amendment is the right to have the evidence presented in a timely manner so that the criminal defendant has an opportunity to refuse it. The prosecutor's comments on matters not in evidence also implicate basic concepts of fundamental fairness. *Cf. See Miller v. State of North Carolina,* 583 F.2d 701, 706 (4th Cir.1978).

Turning to the second interrelated level of inquiry on a claim of improper prosecutorial comment—whether there is a reasonable possibility that the prosecutor's statements might have contributed to petitioner's conviction—the court cannot say that these errors were harmless beyond a reasonable doubt. The two major issues in petitioner's trial were whether petitioner was one of the two men in the liquor store, and whether petitioner pulled the trigger of the murder weapon. The police report comment could have led the jury to believe that police documents, which carry much weight, conclusively established Shaw's role as the gunman.[14] That comment was made in an attempt to bolster the prosecutor's improper argument that defense counsel were "hired guns" seeking to mislead the jury and in the context of the accountability comments which could have led the jury to believe that even if they doubted that Shaw pulled the trigger, he could nevertheless be held liable.[15]

---

**12.** The prosecutor stated:

MR. GARZA: Finally, they would have you be misled by the police reports in this case. You're not going to get those police reports. They're hearsay evidence. You can't have them. If you had them, you would see the truth.
MR. GRIBBEN: Objection.
MR. KUHL: Objection.
THE COURT: Sustained.
(R. 602).

**13.** Any damage done by the prosecutor's reference to the police reports was enhanced by the fact that the prosecutor had the last word. *See Cobb v. Wainwright,* 609 F.2d at 755–56; *Cf. Darden v. Wainwright,* 513 F.Supp. 947, 955 (D.Fla.1981) where, in denying petition for habeas corpus the court noted that the defense attorney had the opportunity during rebuttal to

respond to the prosecutor's closing remarks and turn them against the prosecution.

**14.** Even if the waiver analysis were held to apply to petitioner's accountability instruction claim, *see* fn. 7 *supra,* the prosecutor's reference to police reports not in evidence is sufficient in this case to warrant habeas corpus relief.

**15.** The applicable sections of Illinois law regarding accountability are as follows:

§ 5–2. When Accountability Exists. A person is legally accountable for the conduct of another when:

\* \* \* \* \* \*

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other

While the State's case was considerably stronger on whether Shaw was at the scene of the crime, it was not without some uncertainties on either identification issue. In fact, the prosecution's own witnesses contradicted themselves on the question of identification. The photographic identifications by Lillian and Grandville Farmer, while supporting the conclusion that petitioner was one of the two men in the store the night of the shooting, were not unequivocal. Both identified photographs of other men in addition to those of petitioner and White. Moreover, Mrs. Farmer recalled that she picked out the photos of White and Craig, the two men who were arrested in petitioner's home, on the day of the shooting, while she did not identify the photograph of petitioner until the hearing on the motion to suppress identification which was held several months later.

Evidence even more damaging to the state's case, in light of the fact that the state had to prove that petitioner was the shooter before the jury could find him guilty of murder, was Lillian and Grandville Farmer's testimony that White was the shooter. Lillian Farmer testified in court that petitioner had the gun and that the man with the gun was wearing a gray jacket, but had testified at a preliminary hearing that White was the one who was wearing a gray jacket. Grandville Farmer stated in court that the man wearing a beige or gray jacket was the one who shot Lewis, but stated that petitioner was wearing a navy jacket. Furthermore, although Grandville Farmer identified petitioner as the shooter in the lineup, he identified White as the shooter in court.

Finally, the testimony of the police officers could have produced some doubt in the minds of the jury as to the credibility of the state's witness. According to Officer Leracz, Lillian Farmer had told him on the day of the shooting that the man in the gray coat had purchased the alcohol, and that the man in the gray coat was the man with the gun, while Lillian Farmer testified in court that White had purchased the alcohol but was wearing a blue coat. Also, according to Leracz, none of the witnesses told him they actually saw the shooting.

Officer Rosas testified that Lillian Farmer never said that she knew the shooter, or that he had been in there before, and no one told him that they knew either man. Only "one of the ladies" responded to his request for a description of the offenders, and that reply was "vague". At trial, however, Lillian Farmer testified that she had seen petitioner in the store several times before, and Marva Davis testified that she had known petitioner for three years. Additionally, while Lillian Farmer stated that Marva Davis had screamed, "Why would Phil want to do a thing like that?" immediately after the shooting, Marva Davis' testimony as to whether she mentioned the names of the offenders to the police was vague, and she clearly stated that she did not see the actual shooting.

■ In view of the fact that the only issue in this case was one of identification and the eyewitness trial testimony on that issue was contradictory, this court cannot say that the prosecutor's references to documents not in evidence, which tended to strengthen the State's case on the identification question, was harmless beyond a reasonable doubt. There was "a reasonable possibility that the error[s] might have contributed to the conviction." *United States ex rel. Smith v. Rowe*, 618 F.2d 1204, 1213 (7th Cir.) (prosecutorial comments on defendant's failure to give alibi to law enforcement officers not harmless er-

---

person in the planning or commission of the offense....
Ill.Rev.Stat. ch. 38, § 5–2 (1981).
§ 5–3. Separate Conviction of Person Accountable. A person who is legally accountable for the conduct of another which is an element of an offense may be convicted upon proof that the offense was committed and that he was so accountable ....

Ill.Rev.Stat. ch. 38, § 5–3 (1981).
Under Illinois law, therefore, petitioner could have been tried under a theory of accountability, but that was not the theory relied on by the state in this case, and no instructions on it were given by the court.

ror in light of contradictions in State's identification evidence), *vacated and remanded on other grounds*, 449 U.S. 810, 101 S.Ct. 57, 66 L.Ed.2d 13 (1980). *See also Favre v. Henderson*, 464 F.2d 359 (5th Cir.1972) (admission of disputed testimony not harmless beyond a reasonable doubt since without disputed testimony prosecution had questionable case). Only in situations where the State's evidence is so strong that, even excluding the improper comments, it has proved its case against the defendant beyond a reasonable doubt should the court decline to issue the writ when there has been an error of constitutional magnitude. *Cramer v. Fahner*, 683 F.2d at 1385. *Cf. Dean v. Israel*, 516 F.Supp. 477 (E.D.Wis. 1981) (petition granted even though evidence of guilt overwhelming, because prosecutorial misconduct violated specific constitutional guarantees of Fifth and Sixth Amendments).

■■■ Prejudice caused by improper remarks may be cured by timely objection and appropriate action by the court. *See United States ex rel. Burnett v. Illinois*, 619 F.2d 668, 675 (7th Cir.1980), *cert. denied*, 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104 (1980); *United States ex rel. Clark v. Fike, supra*. The instructions must be considered as a whole, and it is sufficient if they treat the issues fairly and adequately. *United States v. Isaacs, supra*. Even where an objection to an improper remark is overruled, proper instructions may be sufficient to cure an improper remark if the remark, in the context of the entire trial, is not so devastating as to constitute a denial of due process. *United States ex rel. Gardner v. Meyer*, 519 F.Supp. 75, 81 (N.D.Ill.1981).

■■■ Some comments, however, may be too clearly prejudicial for a curative instruction to mitigate. *See Donnelly v. DeChristoforo, supra; United States ex rel.*

*Smith v. Rowe, supra*. In *Rowe*, a general instruction that the arguments of counsel were not evidence, which did not specifically address the issue of whether the defendant could properly be impeached by his pretrial silence, was insufficient to render the prosecutor's reference to the defendant's pretrial silence harmless beyond a reasonable doubt. *See also Houston v. Estelle*, 569 F.2d 372, 373 (5th Cir.1978) (instruction by trial judge that jury disregard improper remarks insufficient to cure prejudice in view of egregiousness of prosecutor's conduct and remarks, prejudicial impact of remarks on defendant's right to object, and excessive punishment imposed by jury which was evidence of jury prejudice).

■■■ In this case the prosecutor's comment regarding the police reports was not cured. Although the court immediately sustained the defense objection to the prosecutor's reference to the police reports and generally instructed the jury that closing arguments are not evidence,[16] no curative instruction was given immediately after the remark was made. Rather than directing the jury's attention to the remark particularly challenged, declaring it to be unsupported, and admonishing the jury to ignore it, *see Donnelly*, the court relied on a general instruction to mitigate any prejudice. In light of the seriousness of the prosecutor's misconduct, the equivocal nature of some of the evidence, and the manifest confusion of the jurors, we cannot say that the trial court's rulings and instructions cured the constitutional errors.

The court concludes, therefore, that there is a reasonable possibility that prosecutorial misconduct contributed to petitioner's conviction, and that the errors were therefore not harmless beyond a reasonable doubt. Accordingly, the petition for habeas corpus is granted, subject to appeal or an expeditious retrial.

---

**16.** The court gave IPI Criminal No. 1.03:

Opening statements are made by the attorneys to acquaint you with the facts they expect to prove. Closing arguments are made by the attorneys to discuss the facts and circumstances in the case, and should be confined to the evidence and to reasonable inferences to be drawn therefrom. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded.