**UNITED STATES of America, ex rel. Phil SHAW, Petitioner-Appellee,**

**v.**

**Richard De ROBERTIS, Warden and Neil Hartigan, Illinois Attorney General, Respondents-Appellants.**

**No. 84–1380.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 22, 1985.

Decided Feb. 20, 1985.

Rehearing Denied April 17, 1985.

David E. Bindi, Asst. Atty. Gen., Chicago, Ill., for respondents-appellants.

Catherine Steege, Jenner & Block, Chicago, Ill., for petitioner-appellee. .

* The Honorable William J. Jameson, Senior District Judge for the District of Montana, sitting

Before ESCHBACH and COFFEY, Circuit Judges, and JAMESON, Senior District Judge.*

ESCHBACH, Circuit Judge.

This is an appeal from the district court's grant of a writ of habeas corpus to Phil Shaw, a prisoner at Stateville Correctional Center, Joliet, Illinois, on grounds that the prosecutor's improper comment during closing argument concerning a police report not admitted into evidence deprived Shaw of a fair trial, in violation of the due process clause of the Fourteenth Amendment. 581 F.Supp. 1397. We affirm.

I

On March 14, 1978, just before closing his liquor store on the south side of Chicago at approximately 2:00 a.m., Edward Lewis let two men into the store, one of whom pulled a gun and shot and killed Lewis. The grand jury subsequently returned an indictment charging petitioner Phil Shaw and another man, Ricardo White, with Lewis's murder. The cases were severed but tried simultaneously in the Circuit Court of Cook County, Shaw's case being tried to a jury while White's was tried to the judge.

At the trial the state sought to convict Shaw on the theory that Shaw actually fired the bullets that killed Lewis, and his case was submitted to the jury on that theory alone. White's case was submitted to the judge on an accountability theory, i.e., accomplice to murder. Thus the dispute at trial centered around two questions: (1) the identities of the two men in the liquor store, and (2) the identity of the man who pulled the trigger. With respect to the charge against Shaw, the state put on the stand three eyewitnesses to the crime: Lillian Farmer and Marva Davis (the cashiers in the liquor store) and Grandville Farmer (Lillian's husband), who was waiting outside the store in a car when the incident occurred.

by designation.

In his closing argument the prosecutor abused the defense attorneys, calling them hired guns paid to mislead the jury, and frauds. After reviewing the testimony of the witnesses, emphasizing throughout the theme that the defense attorneys were trying to mislead the jury, he made the following remark:

> Finally they would have you be misled by the police report in this case. You're not going to get those police reports. They're hearsay evidence. You can't have them. If you had them, you would see the truth.

Both of Shaw's attorneys objected. The judge sustained the objection but gave no curative instruction to the jury.

The jury returned a verdict of guilty, on which the court entered judgment on November 16, 1978. Shaw was sentenced to forty years imprisonment. He appealed to the Illinois Appellate Court, which affirmed his conviction. *People v. Shaw*, 98 Ill. App.3d 682, 54 Ill.Dec. 84, 424 N.E.2d 834 (1981) (1st Dist.). Among the assignments of error was the prosecutor's statement concerning the police report, but the Appellate Court did not comment on that statement in its opinion. The Illinois Supreme Court denied leave to appeal.

On February 19, 1982, Shaw filed a petition for a writ of habeas corpus in the district court. On February 13, 1984, the district court granted the petition, and the state's representatives now appeal.

II

■■ The petitioner contends, and the district court found, that the prosecutor's comment on the police report was a direct violation of the Fourteenth Amendment. In order to constitute a direct violation of the Fourteenth Amendment, the prosecutor's comment must have been misconduct so egregious that it deprived the defendant of a fair trial, thus making the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 647, 94 S.Ct. 1868, 1871, 1873, 40 L.Ed.2d 431 (1974); *see United States ex rel. Clark v. Fike*, 538 F.2d 750, 760 (7th Cir.1976), *cert. denied*, 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781 (1977).[1]

■ There is no question that the prosecutor's comment on the police report was serious misconduct. The prosecutor violated the fundamental rule, known to every lawyer, that argument is limited to the facts in evidence. *United States v. Fearns*, 501 F.2d 486, 489 (7th Cir.1974). By arguing that if the jury could see the police report, they would see the "truth," the prosecutor insinuated a knowledge of prejudicial facts unavailable to the jury and bolstered the inference that the jury was being misled. He invited the jury to rely on the unseen police report as containing additional evidence, indeed decisive evidence, supporting the state's case against Shaw. The prosecutor must have known

---

1. In the context of criminal appeals or habeas proceedings the structure of proof of a direct violation of the Fourteenth Amendment differs from that of a violation of a specific provision of the Bill of Rights made applicable to the states by the Fourteenth Amendment. In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court held that when there is constitutional error of the latter sort, the criminal appellant nevertheless cannot prevail if the court is persuaded that the error was harmless beyond a reasonable doubt. The burden of proving harmlessness falls on the state, as the beneficiary of the error. *Id.* at 24, 87 S.Ct. at 828. In contrast, a criminal appellant or habeas petitioner cannot succeed in showing that prosecutorial misconduct directly violated the Fourteenth Amendment unless he shows that the misconduct made his entire trial

unfair—sufficiently unfair to make his conviction a deprivation of liberty without due process of law. To carry this burden, he must show that it is at least likely that the misconduct complained of affected the outcome of his trial —i.e., caused the jury to reach a verdict of guilty when otherwise it might have reached a verdict of not guilty. The state may of course try to show that the misconduct was harmless beyond a reasonable doubt, but it does not bear the burden—the risk of nonpersuasion—of showing this. The court will deny relief if it finds that the appellant or petitioner has failed to show a likelihood that the misconduct affected the outcome. *See DeChristoforo*, 416 U.S. at 643, 647–48, 94 S.Ct. at 1871, 1873–74; *United States ex rel. Crist v. Lane*, 745 F.2d 476, 482 (7th Cir. 1984).

that such argument is grossly improper and wholly avoidable.

■ The more difficult determination is whether the improper comment made Shaw's trial so unfair as to deny him due process. This requires determining whether it is likely that the comment changed the result of Shaw's trial. *See United States v. Castenada*, 555 F.2d 605, 610 (7th Cir.), *cert. denied*, 434 U.S. 847, 98 S.Ct. 152, 54 L.Ed.2d 113 (1977). In making this determination, we do not consider the comment in isolation but in the context of the entire trial. *United States ex rel. Crist v. Lane*, 745 F.2d 476, 482 (7th Cir.1984); *United States ex rel. Garcia v. Lane*, 698 F.2d 900, 902 (7th Cir.1983).[2]

■ Our examination of the record persuades us that there is a substantial likelihood that the prosecutor's statement changed the result of the trial. In order to convict Shaw, the jury had to find beyond a reasonable doubt that it was Shaw who fired the shots that killed Edward Lewis. The only evidence before the jury was the testimony of the three eyewitnesses, Lillian and Grandville Farmer and Marva Davis, and of the investigating police officers.

Eyewitness testimony placed petitioner in the liquor store but was laced with uncertainties. At trial both Lillian Farmer and Marva Davis identified petitioner as one of the two men who entered the liquor store just before the shooting. Mrs. Farmer had seen both petitioner and White before, and had seen both defendants in the liquor store earlier that evening. Marva Davis testified that she had known petitioner and White for about three years before the shooting incident, and stated that both of them came in the store often. Additionally, Mr. Farmer had identified petitioner in a police lineup on the day of the shooting.

Despite the fact that all three eyewitnesses made positive identifications of petitioner as one of the two assailants who entered the store, certain aspects of the eyewitness testimony also supported the possibility of misidentification. During cross-examination, defense counsel showed Mrs. Farmer photographs of Ricardo White and Robert Craig. She admitted that on the day of the shooting police had presented those photographs to her and she had identified them as Lewis's assailants. On redirect, the state showed Mrs. Farmer some additional photographs and asked if she had picked any of them as depicting Lewis's assailants at the hearing on a motion to suppress identification. Mrs. Farmer indicated that she had selected a photograph of petitioner at the suppression hearing. Additionally, when Mr. Farmer was shown photographs at the police station three or four days after the shooting, he identified photographs of petitioner and Ricardo White, and also picked out a photograph of John Shaw, Phil Shaw's brother, as "favoring" one of the two men he saw in the store. Neither John Shaw nor Robert Craig were in the lineup that Mr. and Mrs. Farmer viewed on the day of the shooting.

Marva Davis's recollection was vague regarding her statements to the police on the night of the murder. She first testified that after the shooting she probably did not mention the names of the offenders to the police, but then stated that she did not know what she told the police. Davis went on to say that she was not sure whether she told the police that White was present but she did tell them that petitioner was there. In further testimony Davis stated she was not sure whether she told police that she knew the two men who came into the store, and did not know whether she gave their names. Davis did state that she gave the police petitioner's phone number

2. Whether prosecutorial misconduct violates the Fourteenth Amendment is a mixed question of fact and law, and our review of the district court's resolution of this ultimate question is de novo. *Armstead v. Maggio*, 720 F.2d 894, 896 (5th Cir.1983); *Taylor v. Lombard*, 606 F.2d 371, 375 (2d Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1346, 63 L.Ed.2d 781 (1980); *see United States ex rel. Scarpelli v. George*, 687 F.2d 1012, 1015 (7th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). Our own determination has been greatly aided by the district court's thorough and accurate analysis of the evidence, which we have independently verified against the record and incorporated into our own opinion, with minor emendations.

the night of the shooting. Officer Rosas, a beat officer, testified that he arrived at the liquor store and spoke with the witnesses shortly after the shooting. According to Rosas none of the witnesses gave him the names of any alleged offenders.

The morning of the shooting police located the assailants' car, identified by Grandville Farmer as being the one he saw leaving the scene of the shooting, in the driveway of petitioner's residence.[3] The auto belonged to Larry Craig. The police found Ricardo White and Robert Craig, but not petitioner, at the residence.

Valerie Johnson, a friend of the Shaw family, testified for the defense. She stated that she received a phone call from Marva Davis several days after the shooting. According to Johnson they discussed the incident and Davis stated that Rick White and "another guy" had been involved. Johnson said that Davis never mentioned petitioner's name. Marva Davis, on cross-examination, testified that Johnson had initiated the telephone call to find out "what was going on." She denied that she had told Johnson that a man named Track shot Lewis or that she had called Johnson because she felt guilty and wanted to know what had happened to petitioner.

The evidence concerning who actually shot Lewis was significantly more contradictory. Although Lillian Farmer said that she saw a gun in petitioner's hand following the shooting, her testimony was inconsistent in her description of the man who had the gun. Mrs. Farmer testified that the first individual to enter the store was White, who immediately went over to Marva Davis, thirty feet to the left of Mrs. Farmer. White then came over to Mrs. Farmer and bought a half-pint of gin. Petitioner was, meanwhile, standing by the cigarette machine near Mrs. Farmer's counter, facing sideways.

Mrs. Farmer then testified that while petitioner was still standing near the ma-chine, about ten feet from Lewis, White and Lewis began "messing around," tussling, pulling, reaching or hitting at each other, and White appeared to be trying to catch Lewis by the arm or go in his pocket. Mrs. Farmer thought they were just playing, and turned to get a Coke that a third customer had ordered. When she turned around, she heard four shots and saw a gun in petitioner's hand pointed at Lewis. Mrs. Farmer then got down on the floor. She described White as "holding his hand or going down by his pocket or whatever he was doing" during the shooting. Petitioner and White then turned and walked out of the store.

On cross-examination Mrs. Farmer stated that White was wearing a navy blue jacket and navy knit skull cap, and that petitioner wore a light beige or gray jacket. She also testified that she told police, right after the incident, that the person who bought the alcohol wore a short blue jacket and cap. But she also admitted that at the preliminary hearing she had testified that White was wearing a gray jacket at the time of the shooting. According to the police investigator who spoke with Mrs. Farmer shortly after the shooting, she had stated at that time that the man in the gray coat, who had the gun, had purchased the alcohol from her.

Marva Davis did not see the shooting. Davis testified that White was wearing a navy blue jacket and Shaw a gray one on the night of the murder. White walked to her register in the back of the store, while Shaw "kind of laid back toward the front." She directed White to the front register because hers was closed. As Davis was counting her money, she heard a number of shots and, describing herself as in a state of shock, got down on the floor upon Mrs. Farmer's instruction and after Mrs. Farmer physically pulled her to the floor. Davis did not see either White or petitioner after she heard the shots, nor did she see who had the gun. Lillian Farmer testified that

---

**3.** At trial Mr. Farmer testified that he had noticed the car parked outside the liquor store before the shooting, with four people in it. The car proceeded down the street a distance after two men got out and went into the liquor store.

Davis screamed, "Why would Phil want to do a thing like that?" after the shooting. Davis, however, gave no testimony that she made a statement concerning either Shaw or White at the time of the shooting.

Mr. Farmer was parked in his car, waiting for his wife to get off work, when the shooting took place. Mr. Farmer stated that he told the police that one of the men had on a light gray or beige jacket and the other one had a dark or navy jacket. He also testified that the man wearing a beige or gray jacket was the one who shot Lewis. Contrary to the testimony of Mrs. Farmer and Marva Davis, however, Mr. Farmer stated that petitioner, wearing a navy jacket, was the one who entered first and walked to the back of the store, and that White, wearing a gray jacket, remained in the front near the cigarette machine. Mr. Farmer saw both men talking and "scuffling" with Lewis and stated that petitioner, wearing the navy jacket, had Lewis by the hand and seemed to be trying to go into Lewis's pockets. Lewis jerked away and faced the man in the gray jacket, who came out with a gun and began shooting. Mr. Farmer testified further that the one who had the gun passed right by him. When asked to point to the man he saw with the gun, Mr. Farmer pointed to Ricardo White.

Over defense counsel's objection Mr. Farmer identified an exhibit as a photograph of a five-man lineup that he had attended on the day of the shooting. On the state's request that he point out the man in the lineup whom he had identified as carrying the gun, Mr. Farmer marked an "X" above petitioner's position.

This was the evidence on which the jury had to base its verdict. Even if the jury concluded that Phil Shaw was one of the two men who entered the store, it must have had difficulty with the question whether he fired the fatal shots. Marva Davis did not see the shooting and did not testify as to the identity of the gunman. Grandville Farmer identified Ricardo White as the shooter, although the prosecutor, in an apparent attempt to impeach his own witness, elicited from him the information that he had previously identified Shaw as the gunman in a lineup. Only Lillian Farmer identified Shaw as the man with the gun, and she was impeached by prior inconsistent statements.

That the jury found the testimony confusing is evidenced by the question it sent to the judge after deliberating a while:

If a man is an accomplice to murder, will the law indict him on a charge of murder, or accomplice to murder?

The judge replied that the instructions given adequately set forth the law to be followed and that the jury would not receive any other instructions as to the law. Twenty minutes later, the jury returned its verdict of guilty.

It is a reasonable inference from this question that the jury had concluded that Shaw was one of the two men involved in the murder, but that at least some jurors were in doubt that he had pulled the trigger.[4] Somehow the jury managed to resolve those doubts against Shaw. While it is by no means certain that the jury relied on the prosecutor's statement concerning the police report, the totality of the circumstances makes it sufficiently likely to convey the prosecutor's statement out of the region of constitutionally permissible conduct. These circumstances include the fact

4. In his closing argument the prosecutor informed the jury that an accomplice to murder is guilty of murder. Commenting on the fact that police found White and John Craig, but not Shaw, at Shaw's house shortly after the shooting, he said:

And Phil Shaw is somehow missing that two or three or four, A.M., from his morning [sic], from his home, and the others aren't. And you must ask yourselves, why that is. He's nowhere to be found, Ladies and Gentlemen. For good reason. Ricky White is to be found,

because he's probably not sharp enough to realize that there is a law in this State about accountability. You can be held accountable for the actions of—[here Shaw's attorneys made objections, which the court overruled.] If you are with a gunman and do anything to aid that gunman, that you can be convicted of murder. Ricardo White doesn't realize that he should flee. Certainly doesn't realize that, but Phil Shaw realizes that because the gun was in his hand, and that's why he is not at home.

that the judge gave no curative instruction to the jury when the statement was made,[5] the fact that the statement was made in rebuttal argument, giving the defendant no opportunity to respond, and the fact that the statement was made in the context of an argument in which the prosecutor abused the defense attorneys and repeatedly accused them of trying to mislead the jury.

The judgment of the district court granting a writ of habeas corpus is

AFFIRMED.

---

**5.** In charging the jury, the judge gave the following instruction:

Opening statements are made by the attorneys to acquaint you with the facts they expect to prove. Closing arguments are made by the attorneys to discuss the facts and circumstances in the case, and should be confined to the evidence and to reasonable inferences to be drawn therefrom. Neither opening statements nor closing arguments are evidence, and any statements or argument made by the attorneys which is not based on the evidence should be disregarded.

In light of the seriousness of the prosecutor's misconduct, the equivocal nature of the evidence, and the manifest confusion of the jurors, we cannot say that this instruction cured the constitutional error.